**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CAMPAIGN LEGAL CENTER**, *et al.*, | |
| **Plaintiffs,** | |
| v. | **Civil Action No.  19-2336 (JEB)** |
| **FEDERAL ELECTION COMMISSION,** | |
| **Defendant,** | |
| **and** | |
| **HILLARY FOR AMERICA**, *et al.*, | |
| **Defendant-Intervenors.** | |

## MEMORANDUM OPINION

As the country turns its attention to the upcoming 2020 presidential election, embers from the 2016 campaign continue to smolder.  Although most media attention remains focused on Russian interference and missing emails, Plaintiff Campaign Legal Center has a separate bone to pick.  In October 2016, it filed an administrative complaint with Defendant Federal Election Commission, alleging that Hillary Clinton's campaign committee and a super PAC worked together to violate federal election law by failing to report almost $6 million in service-related (or "in-kind") contributions.  While the FEC's Office of General Counsel found reason to believe the allegations, the Commission had only four of its six statutory members and ended up deadlocking 2-2, which resulted in the dismissal of the complaint.

CLC now challenges that dismissal in this Court, but the FEC, hobbled by its empty seats, could not even garner the votes needed to defend the suit.  Into the breach stepped Defendant-Intervenors Hillary for America and Correct the Record, the subjects of the

administrative complaint.  HFA and CTR now move to dismiss the Amended Complaint, arguing

that CLC lacks standing or, in the alternative, has not stated a claim upon which relief could be

granted.  Disagreeing on both points, the Court will deny the Motion.

## I.      Background

The Court begins by laying out the relevant statutory framework before recounting the

factual and procedural history of this case.

### A.  Statutory Scheme

The Federal Election Campaign Act was passed in 1971 with the aim of "remedy[ing]

any actual or perceived corruption of the political process."  FEC v. Akins, 524 U.S. 11, 14

(1998).  In service of that goal, the Act sets forth two groups of rules: the first limits the amount

and source of money that can be contributed to campaigns for federal office, and the second

requires those campaigns to report their contributions and expenditures.  See id.; see also 52

U.S.C. § 30101(8)(A) (defining "contribution" to include both "(i) any gift, subscription, loan,

advance, or deposit of money or anything of value [given] by any person for the purpose of

influencing any election for Federal office" and "(ii) the payment by any person of compensation

for the personal services of another person which are rendered to a political committee without

charge for any purpose"); id. § 30101(11) (defining "person" to "include[] an individual,

partnership, committee, association, corporation, labor organization, or any other organization or

group of persons" other than federal governmental ones).

The rules set forth by the statute apply not only to contributions made directly to a

candidate but also to coordinated expenditures, which are those "made by any person in

cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his

authorized political committees, or their agents."  52 U.S.C. § 30116(a)(7)(B)(i); see also 11

C.F.R. § 109.20(a) (defining "coordinated" similarly). "Expenditures coordinated with a candidate, that is, are contributions under the Act." FEC v. Colo. Republican Fed. Campaign Comm., 533 U.S. 431, 438 (2001). Coordinated expenditures are necessarily in-kind contributions, as opposed to direct financial ones, since they are services rendered to the campaign. See In-kind Contributions, Fed. Election Comm'n, https://www.fec.gov/help-candidates-and-committees/filing-reports/in-kind-contributions/ (last visited June 4, 2020). Placing coordinated expenditures within FECA's reach "prevent[s] attempts to circumvent the Act through . . . disguised contributions." Buckley v. Valeo, 424 U.S. 1, 47 (1976).

Subsequent campaign-finance law also makes explicit that some communications amount to coordinated expenditures. Under the relevant regulations, "communications count as 'coordinated' (and thus as contributions) if: (1) someone other than the candidate, party, or official campaign pays for them, (2) the communication itself meets specified 'content standards,' and (3) the payer's interaction with the candidate/party satisfies specified 'conduct standards.'" Shays v. FEC, 414 F.3d 76, 98 (D.C. Cir. 2005) (quoting 11 C.F.R. § 109.21(a)). The "content standards" referred to in subsection (2) of the regulation require the communication to be a "public" one. See 11 C.F.R. § 109.21(c). As relevant here, a communication is not public if it is "over the Internet, except for communications placed for a fee on another person's Web site." Id. § 100.26. In other words, the only Internet communications that could count as coordinated communications — and thus the only ones that could be regulated as contributions — are paid ones. The interpretation of this internet-communications rule is one of the main substantive disputes in this case.

As just stated, when an internet communication does count as a coordinated communication, it is subject to the contribution limits and reporting requirements of

"coordinated expenditures" under the Act.  Most relevant here are the requirements for reporting

coordinated expenditures between authorized and unauthorized committees.  An "authorized"

committee is a candidate's "principal campaign committee" — here, Hillary for America.  See

52 U.S.C. § 30101(6).  There are several types of unauthorized committees; Correct the Record

is a "hybrid" or "Carey" political action committee (PAC), which maintains two separate bank

accounts, one for raising unlimited contributions for "independent" activities not subject to

campaign-finance laws, and one for raising limited contributions for candidates, subject to FECA

and its regulations.  See FEC Statement on Carey v. FEC (2011) (Oct. 6, 2011), Fed. Election

Comm'n, https://www.fec.gov/updates/fec-statement-on-carey-v-fec/; see also Carey v. FEC,

No. 11-259 (D.D.C. Aug. 19, 2011) (Stipulated Order and Consent Judgment).  For purposes of

the present Motion, the Court concerns itself only with the arm of CTR that is subject to FECA.

When an unauthorized committee like CTR makes any kind of contribution — including,

as explained above, coordinated expenditures — to an authorized committee like HFA, both

sides must disclose these contributions, reporting the date and value of each.  See 52 U.S.C.

§ 30104(b)(2)(D), (b)(3)(B) (authorized committee); id. § 30104(b)(6)(B)(i) (unauthorized

committee).  Because coordinated expenditures are not only "contributions" but also

"expenditures," they must additionally be reported as such by both committees, again itemized

and with detailed information for  — including the purpose of  — each transaction.  See 11

C.F.R. §§ 104.13(a), 109.20(b), 109.21(b) (authorized committee); 52 U.S.C. § 30104(b)(5)(C)

(unauthorized committee).

In addition to creating substantive campaign-finance law, the Act sets out the scheme for

its enforcement: "Any person who believes a violation of [FECA] . . . has occurred[] may file a

complaint with the Commission."  52 U.S.C. § 30109(a)(1).  The Federal Election Commission,

statutorily made up of six politically diverse voting members, see id. § 30106(a)(1)–(2), must in turn notify the "person alleged in the complaint to have committed such a violation." Id. § 30109(a)(1).

After a period for that respondent to rebut the complaint, the Commission votes as to whether it "has reason to believe" that the respondent violated FECA. Id. § 30109(a)(2). It is aided in this determination by briefs submitted by both its Office of General Counsel and the respondent stating their respective positions "on the legal and factual issues of the case." Id. § 30109(a)(3). Four Commissioners must vote in the affirmative for the case to move on to an investigation. Id. § 30109(a)(2). If the Commission does not so find and thus dismisses the administrative complaint, the complainant may then "file a petition with the United States District Court for the District of Columbia" within 60 days of the dismissal. Id. § 30109(a)(8)(A)–(B). The Commission must again have four affirmative votes to defend such a civil action against the dismissal order. Id. §§ 30106(c), 30107(a)(6).

This Court's review of such a petition is limited: it "may declare that the dismissal of the complaint or the failure to act [was] contrary to law." Id. § 30109(a)(8)(C). The D.C. Circuit has interpreted this to mean that courts "may not disturb a Commission decision to dismiss a complaint unless the dismissal was based on an 'impermissible interpretation of the Act . . . or was arbitrary or capricious, or an abuse of discretion.'" Common Cause v. FEC, 108 F.3d 413, 415 (D.C. Cir. 1997) (omission in original) (quoting Orloski v. FEC, 795 F.2d 156, 161 (D.C. Cir. 1986)). If the Court does find that the dismissal was contrary to law, "[it] may direct the Commission to conform with such declaration within 30 days." 52 U.S.C. § 30109(a)(8)(C).

The FEC had all six voting Commissioners for several years leading up to 2017. All Commissioners, Fed. Election Comm'n. https://www.fec.gov/about/leadership-and-

structure/commissioners/ (last visited June 4, 2020).  But as of June 2019, when it voted on the

complaint at issue in this case, it was two voting members short.  Id.  It lost another member in

August 2019, id., meaning that the Commission has been unable to pursue any enforcement

actions or defend its choices not to in district court.

      B.  Factual History

      Correct the Record, as noted above, is a hybrid or Carey political-action committee, the

non-independent branch of which was dedicated to supporting Hillary Clinton's presidential

candidacy.  See ECF No. 26 (Defendant-Intervenors' Amended MTD) at 5.  Hillary For America

is Clinton's candidate-authorized (or campaign) committee.  See id.

      In October 2016, Plaintiff Campaign Legal Center, a non-profit organization dedicated to

"improving democracy and promoting representative, responsive, and accountable government

for all citizens," ECF No. 15 (Amended Complaint), ¶ 15, filed an administrative complaint with

the FEC, alleging that CTR had made, and HFA had accepted, "up to $5.95 million in in-kind

contributions in the form of coordinated expenditures in violation of [FECA]."  ECF No. 15-1

(Administrative Complaint), ¶ 1.  This money, CLC stated, was spent by CTR on "opposition

research, message development, surrogate training and booking, professional video production,

and press outreach for the benefit of the Clinton campaign."  Id., ¶ 5.  Because CTR did not

consider these to be coordinated communications (in part because of its interpretation of the

internet-communications regulation, set forth in more detail below), neither it nor HFA reported

these transactions as expenditures or contributions.  Id., ¶ 9 (noting that CTR had made statement

to Washington Post claiming that putting these communications online made their costs free

from regulation); see Matea Gold, How a Super PAC Plans to Coordinate Directly with Hillary

Clinton's Campaign, Wash. Post (May 12, 2015, 10:21 PM), https://www.washingtonpost.com/

news/post-politics/wp/2015/05/12/how-a-super-pac-plans-to-coordinate-directly-with-hillary-clintons-campaign/ ("Correct the Record believes it can avoid the coordination ban by relying on a 2006 Federal Election Commission regulation that declared that content posted online for free, such as blogs, is off limits from regulation.").

CLC disagreed.  In its administrative complaint, Plaintiff argued that CTR's actions — and both CTR's and HFA's failure to report such actions as expenditures or contributions — had run afoul of (1) "FECA's $2,[0]00 limit on contributions by [an unauthorized] committee to a candidate," Admin. Compl., ¶ 2 (citing 52 U.S.C. § 30116(a)(1)); (2) "FECA's prohibition on contributions to a candidate using union and corporate funds," id. (citing 52 U.S.C. § 30118(a), (b)(2)); and (3) "FECA's requirement that political committees report and disclose all contributions made to candidates."  Id. (citing 52 U.S.C. § 30104(b)).

The Commission grouped this complaint with similar ones filed by others, and OGC, after an investigation, recommended that the Commissioners find reason to believe that HFA and CTR had violated FECA in the three ways CLC had alleged.  See ECF No. 26-4 (Office of General Counsel Reports) at ECF p. 28.  It also recommended that the Commission "[d]ismiss" or "[t]ake no action" as to several other violations alleged in other administrative complaints.  Id. The Commissioners then split 2-2, however, as to whether to find reason to believe HFA and CTR had illegally coordinated with each other; as such, they did not have the four votes needed to proceed.  See ECF No. 26-5 (FEC Amended Certification) at 1.  The Commissioners consequently dismissed the administrative complaints.  Id. at 4.

In a Statement of Reasons published two months later, Republican Commissioners Caroline Hunter and Matthew Petersen explained their votes against finding that HFA and CTR had violated FECA.  See ECF No. 15-2 (Petersen & Hunter SOR).  They interpreted the internet-

communications rule to mean that <u>any</u> expenditure could be exempted from regulation if it ultimately resulted in an unpaid internet communication.  <u>Id.</u> at 11 (concluding that "Correct the Record's expenses for its online communications, including creation and production costs, are not in-kind contributions to Hillary for America under the 'coordinated communication' standard at 11 C.F.R. § 109.21").  This meant that "Correct the Record's expenses for, for example, computer equipment, office space, software, web hosting, video equipment, placing a poll online, and salaries for individuals to conduct internet activity (posting on social media and e-mailing journalists)" did <u>not</u> count as coordinated communications and thus could not be regulated as contributions under the Act.  <u>Id.</u> at 12.  The two Commissioners further found that available information about CTR's spending "unrelated to creating and disseminating online political communications . . . did not support finding reason to believe [CTR] and [HFA] violated the Act."  <u>Id.</u> at 11.

C.  <u>Procedural History</u>

In August 2019, CLC and one of its directors, Catherine Hinckley Kelley, filed this suit challenging the FEC's dismissal order as "contrary to law" per 52 U.S.C. § 30109(a)(8).  <u>See</u> ECF No. 1 (Complaint) at 22–23.  Plaintiffs, whom the Court will jointly refer to as CLC, have since amended their Complaint.  <u>See</u> ECF No. 15.  The FEC, however, failed to garner the four affirmative votes required by 52 U.S.C. §§ 30106(c) and 30107(a)(6) for the agency to defend this civil suit.  <u>See</u> FEC Amended Certification at 3.  The vote was 3-1, with Democratic then-Chair Ellen Weintraub dissenting.  <u>Id.</u>; <u>see also</u> ECF No. 27-6 (Weintraub SOR).  Notwithstanding the Commission's apparent default, this Court permitted HFA and CTR to intervene as Defendants in November 2019 over Plaintiffs' objection.  <u>Campaign Legal Ctr. v. FEC</u>, 334 F.R.D. 1, 5–7 (D.D.C. 2019).

8

Defendant-Intervenors now move to dismiss the Amended Complaint, arguing first that Plaintiffs do not have standing to bring the suit and, in the alternative, that they have failed to state a claim under Federal Rule of Procedure 12(b)(6).

## II.     Standing

The Court begins, as it must, by considering its own jurisdiction to hear this case.  <u>See</u> <u>Steel Co. v. Citizens for a Better Env't</u>, 523 U.S. 83, 94–95 (1998) ("The requirement that jurisdiction be established as a threshold matter 'spring[s] from the nature and limits of the judicial power of the United States' and is 'inflexible and without exception.'") (alteration in original) (quoting <u>Mansfield, Coldwater & Lake Mich. Ry. Co. v. Swan</u>, 111 U.S. 379, 382 (1884)).  If Defendant-Intervenors are correct that Plaintiffs lack standing, the matter is nonjusticiable and dismissal is required.

Standing is "a doctrine rooted in the traditional understanding of a case or controversy" in Article III of the Federal Constitution.  <u>Spokeo, Inc. v. Robins</u>, 136 S. Ct. 1540, 1547 (2016).  It requires, at a minimum, that a plaintiff show that she "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  <u>Id.</u> at 1547.  The "injury in fact" must be both "(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical."  <u>Friends of the</u> <u>Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.</u>, 528 U.S. 167, 180 (2000).  An injury is "particularized" when it "affect[s] the plaintiff in a personal and individual way," and it is "concrete" when it is "real, and not abstract," <u>Spokeo</u>, 136 S. Ct. at 1548 (quotation marks omitted), although "intangible injuries can nevertheless be concrete."  <u>Id.</u> at 1549.  At the motion-to-dismiss stage, plaintiffs "need only 'state[] a plausible claim' that each element of

standing is satisfied." Hancock. v. Urban Outfitters, Inc., 830 F.3d 511, 513 (D.C. Cir. 2016) (alteration in original) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009)).

The standing analysis here is more nuanced given the atypical injury that CLC alleges.  In seeking dismissal, consequently, Defendant-Intervenors principally argue that Plaintiffs have not established that (1) they suffered the type of "informational" injury sufficient for standing under FECA; and (2) CLC has "organizational" standing.  The Court will address each topic separately.

A. Informational Injury

"The law is settled that a denial of access to information qualifies as an injury in fact where a statute (on the claimants' reading) requires that the information be publicly disclosed and there is no reason to doubt their claim that the information would help them." Campaign Legal Ctr. v. FEC, 952 F.3d 352, 356 (D.C. Cir. 2020) (quoting Envtl. Def. Fund v. EPA, 922 F.3d 446, 452 (D.C. Cir. 2019)).  The language of FECA, the Supreme Court has noted, evinces "a congressional intent to cast the standing net broadly." Akins, 524 U.S. at 19.

In order to establish injury in fact, therefore, Plaintiffs must show that, if they prevail, some information helpful to them would be newly disclosed.  They cannot, however, be seeking merely "a legal characterization or duplicative reporting of information that under existing rules is already required to be disclosed." Wertheimer v. FEC, 268 F.3d 1070, 1075 (D.C. Cir. 2001). In other words, if the information CLC desires is already available without a favorable interpretation of FECA, they do not have standing.  Indeed, Defendant-Intervenors claim that this is precisely the case.  The easiest way to discern whether their argument has merit is to answer two simple (at least, in the asking) questions: what information does CLC have access to now, and what would it have access to if successful on the merits in this suit?

To illuminate these queries, the Court must dive into the record.  Take, first, CTR's salary payments to its founder and chairman David Brock.  CTR disclosed the fact of each payment, but no more specific information, labeling them as "Salary: Non-Contribution Account."  ECF No. 27-4 (CTR Disbursements to David Brock).  In other words, CTR averred that no part of Brock's salary counted as a "contribution" under FECA.  As CLC puts it, "This method of . . . reporting Brock's salary would be accurate and complete only if all of Brock's work during that pay period was either uncoordinated with HFA or" properly exempted from regulation under the internet-communications exception.  See ECF No. 27 (Plaintiffs' Opp. to MTD) at 18.  (Recall that HFA, CTR, and the two Commissioners who ruled in their favor interpret the FECA regulations to exempt all expenditures that lead to an unpaid internet communication, including all "production costs.")

Would these disclosures look different if CLC was successful in its suit?  In a nutshell, CTR would have to report both (a) how much of Brock's salary paid for production costs related to internet communications not properly exempted from regulation under Plaintiffs' interpretation of the internet-communications exception, and (b) any of his other activities that were, despite CTR's characterization, coordinated with HFA.  See 52 U.S.C. § 30104(b)(2)(D), (b)(3)(B), (b)(5)(A), (b)(6)(B)(i) (requiring itemization of "contributions" and "expenditures" between authorized and unauthorized committees, including, for example, each item's date, value, and purpose); 11 C.F.R. §§ 104.13(a), 109.20(b), 109.21(b) (same).

That such "information would help" Plaintiffs, Envtl. Def. Fund, 922 F.3d at 452 (quoting Friends of Animals v. Jewell, 824 F.3d 1033, 1040–41 (D.C. Cir. 2016)), is clear.  If, once reported, the sum of all these items constituted even 1.5% of Brock's salary, CTR would have violated FECA's contribution limits.  See 52 U.S.C. § 30116(a)(1) (setting contribution

limit at $2,000); Brock Disbursements at 1–4 (listing salary payments totaling $168,681.28 between May 2015 and November 2016).  Indeed, OGC found that CTR had spent millions "on a wide array of activities, most of which are not fairly characterized as [non-coordinated] 'communications,' in furtherance of its stated mission of working in support of Clinton's candidacy in coordination with HFA."  OGC Reports at ECF p. 6.  But without itemized disclosures, CLC has no information as to the actual amount of money that, in its view, should have been considered a contribution or expenditure under the Act.  This is information that is helpful to them beyond just this lawsuit; as discussed in more detail below, full and accurate campaign-finance reporting is crucial to CLC's mission of "improving democracy and promoting representative, responsive, and accountable government for all citizens," in service of which it "engages in litigation, regulatory practice, legislative policy, and public education."  Am. Compl., ¶ 15.

As a second example, consider the money CTR spent on travel, totaling "over $589,000." OGC Reports at ECF p. 22.  Not one cent of this sum is reported as a "contribution," again because CTR did not consider any of it to be coordinated with HFA.  Id.; see Disbursements (Committee: Correct the Record, Time Period: 2015-2016, Description: Travel), Fed. Election Comm'n, https://www.fec.gov/data/disbursements/?disbursement_++description=Travel&data_type=processed&committee_id=C00578997&two_year_transaction_period=2016&disbursement_description=Travel (last visited June 4, 2020).  As a result, CTR (and HFA) did not have to disclose the purpose of such disbursements, see 52 U.S.C. § 30104(b)(2)(D), (b)(3)(B), (b)(6)(B)(i), so CLC is deprived of the knowledge of which disbursements — or what portion of each disbursement — was actually made in coordination with HFA.  Given that OGC found that "CTR systematically coordinated with HFA on its activities," OGC Reports at ECF p. 17, it

seems likely that some portion of CTR's travel was "in cooperation, consultation, or concert, with, or at the request or suggestion of" HFA, see 52 U.S.C. § 30116(a)(7)(B)(i), but CLC cannot know this amount (or whether it surpasses the statutory contribution limit) without itemized disclosures.

As both examples demonstrate, Plaintiffs are not seeking "information that under existing rules is already required to be disclosed." Wertheimer, 268 F.3d at 1075. This new information, moreover, will remain unavailable to Plaintiffs (at least via FECA disclosure) without a favorable ruling in this case. Because CLC has proven its informational injury, and because such injury is caused by the unfavorable FEC ruling and would be redressed by vacatur of that decision, the Court rejects Defendant-Intervenors' challenges to CLC's "informational" standing.

This conclusion is bolstered by a recent March 2020 decision by the D.C. Circuit, finding that CLC had informational standing in another case against the FEC. CLC and a different organization there "allege[d] violations of FECA provisions," including 52 U.S.C. § 30104, that require "the filing of public reports by political committees." CLC, 952 F.3d at 356. On similar evidence about CLC's activities, see id. (citing declaration of CLC attorney), the court found no reason to doubt "that the disclosures [CLC] s[ought] would further their efforts to defend and implement campaign finance reform." Id. Compare Campaign Legal Ctr v. FEC, No. 18-2539 (D.C. Cir. Aug. 2, 2016), ECF No. 18-1 (Declaration of Paul S. Ryan), with Campaign Legal Ctr. v. FEC, No. 19-2336 (D.D.C. Mar. 5, 2020), ECF No. 27-2 (Declaration of Brendan Fischer).

B. Organizational Standing

HFA and CTR launch a second, distinct challenge to CLC's standing in this case. As an organization, CLC must prove that the entity itself has suffered an injury — in other words, that it satisfies the doctrine of "organizational" standing. See Equal Rights Ctr. v. Post Props., Inc.,

633 F.3d 1136, 1138 (D.C. Cir. 2011).  Defendant-Intervenors argue that CLC falls short.

Organizational standing, to be clear, should not be confused with associational or

representational standing, which is for groups that have individual members.  See id. ("An

organization . . . can assert standing on its own behalf [via organizational standing], on behalf of

its members [via associational/representational standing,] or both.").  There are two requirements

for organizational standing: (1) the agency action or omission must injure the organization's

interest, and (2) the organization must have used its resources to counteract that harm.  PETA v.

USDA, 797 F.3d 1087, 1094 (D.C. Cir. 2015); see also Am. Legal Found. v. FCC, 808 F.2d 84,

92 (D.C. Cir. 1987) ("The organization must allege that discrete programmatic concerns are

being directly and adversely affected by the defendant's actions.").  Defendant-Intervenors

mount their attack via both prongs.

### 1. *Injury to Organization's Interest*

An organization wishing to prove standing in its own right "must allege a 'concrete and

demonstrable injury to the organization's activities' that is 'more than simply a setback to the

organization's abstract social interests.'"  Am. Anti-Vivisection Soc'y v. USDA, 946 F.3d 615,

618 (D.C. Cir. 2020) (quoting Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 (1982)).

"Under our case law, an organization's diversion of resources to litigation or to investigation in

anticipation of litigation is considered a 'self-inflicted' budgetary choice that cannot qualify as

an injury in fact for purposes of standing."  Am. Soc'y for Prevention of Cruelty to Animals v.

Feld Entm't, Inc., 659 F.3d 13, 25 (D.C. Cir. 2011) (citing Equal Rights Ctr., 633 F.3d at 1139–

40).

Such an injury has been found where, for example, an agency's statutory interpretation

"deprived [the organization] of key information that it relies on to educate the public" where

such public education was "[o]ne of the primary ways in which [the organization] accomplishe[d] its mission." PETA, 797 F.3d at 1094 (quotation marks omitted) (quoting PETA v. USDA, 7 F. Supp. 3d 1, 8 (D.D.C. 2013)); see also Am. Anti-Vivisection Soc'y, 946 F.3d at 619 (same). But the D.C. Circuit "has distinguished between organizations that allege that their activities have been impeded from those that merely allege that their mission has been compromised." Food & Water Watch, Inc. v. Vilsak, 808 F.3d 905, 919 (D.C. Cir. 2015). To that end, "an organization does not suffer an injury in fact where it 'expend[s] resources to educate its members and others' unless doing so subjects the organization to 'operational costs beyond those normally expended.'" Id. at 920 (alteration in original) (quoting Nat'l Taxpayers Union, Inc. v. United States, 68 F.3d 1428, 1434 (D.C. Cir. 1995)).

Another way that an organization may allege sufficient injury to its interests is where the agency action at issue "limits [the organization's] ability to seek redress for a violation of law." Food & Water Watch, 808 F.3d at 921; see also Action Alliance of Senior Citizens of Greater Philadelphia v. Heckler, 789 F.2d 931, 937–38 (D.C. Cir. 1986) (finding such injury where complainants, as in Havens, pled that "the challenged regulations den[ied] the . . . organizations access to information and avenues of redress they wish to use in their routine information-dispensing, counseling, and referral activities").

Plaintiffs allege just such injuries to CLC's mission and activities. In their Amended Complaint, they state:

> When inadequate disclosure of federal campaign finance activity makes it difficult to ascertain the origin and magnitude of a candidate's financial support, as occurs when a candidate's fundraising and media operations are illegally outsourced to an "independent" super PAC without disclosure, reporters often contact CLC for guidance as to whether or where they can find the campaign finance information that is not being properly reported.

> This work requires CLC to divert resources and funds from other organizational needs.

Am. Compl., ¶ 24.  This statement pleads both types of organizational injury described above.  In fact, the injury to CLC's public-education activities goes well beyond those deemed sufficient in American Anti-Vivisection Society and PETA: the organization here is describing not only proactive efforts to educate the public, see id., ¶¶ 15–17, but also a need to respond to requests from reporters.

Plaintiffs, moreover, have also contended that the FEC's dismissal of their administrative complaint hinders CLC's "ability to seek redress for a violation of law."  Food & Water Watch, 808 F.3d at 921.  In their Amended Complaint, they state that the dismissal "deprived [it] of disclosure about the scale and scope of CTR's expenditures coordinated with the Clinton campaign," information that "CLC needs for work central to its mission."  Am. Compl., ¶ 11.  CLC describes that mission as "improving democracy and promoting representative, responsive, and accountable government for all citizens," and it "engages in litigation, regulatory practice, legislative policy, and public education" in service of that goal.  Id., ¶ 15.  These injuries are surely "more than simply a setback to the organization's abstract social interests."  Am. Anti-Vivisection Soc'y, 946 F.3d at 618 (quoting Havens, 455 U.S. at 379).

2.  *Use of Organization's Resources*

Defendant-Intervenors devote barely two sentences to the second, resource-focused prong of organizational injury, arguing that because "CLC's amended complaint does not allege that its resources have been depleted," it has not sufficiently pled organizational injury "as a legal matter."  Am. MTD at 16.  The case they cite for this proposition does not use any form of the word "deplete" but does state that the injury must result in a "consequent drain on the organization's resources."  Common Cause, 108 F.3d at 417.  Yet CLC does plead such a drain,

16

alleging in its Amended Complaint that inadequate disclosure under FECA "requires [it] to divert resources and funds from other organizational needs." Am. Compl., ¶ 24. Resources do not grow on trees — when an organization has to "divert" them from an area where it planned to spend time and money to one where it did not, that leaves fewer resources for its "other organizational needs." Id. Indeed, CLC also regularly "expends significant resources to assist reporters and other members of the media in their investigative research into candidates' financial support," efforts that require more resources when inadequate disclosure hinders them. Id., ¶ 22. In any event, Defendant-Intervenors appear to fabricate a magic-words requirement that does not exist in the caselaw. Other, more recent cases describe the same requirement by stating that the organization must have "used its resources to counteract th[e] harm." Equal Rights Ctr., 633 F.3d at 1140; see also PETA, 797 F.3d at 1094 (same). The Court will not take the narrowest interpretation of one iteration of this standard as an absolute maxim. CLC has clearly pled with adequate detail that it must use resources to counteract the harms of inadequate disclosure, and that is all that is required.

* * *

As shown above, CLC has proven its standing to bring this case. Assured of its jurisdiction, then, the Court moves on to the merits. It will first discuss the legal standard and then proceed with its analysis.

## III.   Legal Standard

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of an action where a complaint fails "to state a claim upon which relief can be granted." In evaluating a defendant's motion to dismiss, the Court must "treat the complaint's factual allegations as true and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" Sparrow

v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting Schuler v. United

States, 617 F.2d 605, 608 (D.C. Cir. 1979)) (citing Leatherman v. Tarrant Cty. Narcotics

Intelligence and Coordination Unit, 507 U.S. 163, 164 (1993)); see also Jerome Stevens Pharms.,

Inc. v. FDA, 402 F.3d 1249, 1250 (D.C. Cir. 2005).

Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6)

motion, Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), "a complaint must contain

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570).  The court

need not accept as true, then, "a legal conclusion couched as a factual allegation," nor an

inference unsupported by the facts set forth in the complaint.  Trudeau v. FTC, 456 F.3d 178,

193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)).  For a plaintiff to

survive a 12(b)(6) motion even if "recovery is very remote and unlikely," the facts alleged in the

complaint "must be enough to raise a right to relief above the speculative level." Twombly, 550

U.S. at 555–56 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

As noted in Section I.A, the central question for a court reviewing the FEC's decision to

dismiss an administrative complaint is whether that dismissal was "contrary to law."  52 U.S.C.

§ 30109(a)(8)(C).  "The Commission's decision is contrary to law 'if (1) the FEC dismissed the

complaint as a result of an impermissible interpretation of the Act, or (2) if the FEC's dismissal

of the complaint, under a permissible interpretation of the statute, was arbitrary or capricious, or

an abuse of discretion.'"  CLC, 952 F.3d at 357 (quoting Orloski, 795 F.2d at 161).  As to the

first of these, the court's task is "not to interpret the statute as it th[inks] best but rather the

narrower inquiry into whether the Commission's construction was 'sufficiently reasonable' to be

accepted by a reviewing court."  FEC v. Democratic Senatorial Campaign Comm'n, 454 U.S. 27,

39 (1981); see CLC, 952 F.3d at 357 (same).

The second means by which a dismissal may be declared "contrary to law" will be familiar to any frequent reader of administrative-law opinions, since it is the standard of review provided by the Administrative Procedure Act. See 5 U.S.C. § 706(2)(A) (requiring reviewing courts to "hold unlawful and set aside agency action" that is "found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"). While the APA may also provide a cause of action — more on that later, see infra Section IV.B — here the Court borrows only its standard of review. Cf. Conservation Law Found. v. Ross, 422 F. Supp. 3d 12, 27 (D.D.C. 2019) ("While the subject of review is whether the [agency] violated the ESA, the standard of review is thus found in APA precedent.").

The APA "sets forth the full extent of judicial authority to review executive agency action for procedural correctness." FCC v. Fox Television Stations, Inc., 556 U.S. 502, 513 (2009) (citing Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 545–49 (1978)). Agency action is arbitrary and capricious if, for example, the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). "'The scope of review [in an APA case] is narrow and a court is not to substitute its judgment for that of the agency,' provided the agency has 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" Airmotive Eng'g Corp. v. FAA, 882 F.3d 1157, 1159 (D.C. Cir. 2018) (second and third alterations in original) (quoting State Farm, 463 U.S. at 43). While the Court "may not supply a reasoned basis for the agency's

action that the agency itself has not given, [it] will uphold a decision of less than ideal clarity if

the agency's path may reasonably be discerned."  Bowman Transp., Inc. v. Ark.-Best Freight

Sys., Inc., 419 U.S. 281, 285–86 (1974) (citation omitted) (citing SEC v. Chenery Corp., 332

U.S. 194, 196 (1947); then citing Colo. Interstate Gas Co. v. FPC, 324 U.S. 581, 595 (1945)).  It

is only these "certain minimal standards of rationality" to which a reviewing court holds an

agency.  Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA, 686 F.3d 803, 810 (D.C. Cir. 2012)

(quoting Ethyl Corp. v. EPA, 541 F.2d 1, 36–37 (D.C. Cir. 1976) (en banc)).

## IV.    Analysis

At long last, we reach base camp: what remains is to scale the merits of the case.  Hillary

for America and Correct the Record contend that Plaintiffs' Amended Complaint fails to state a

claim upon which relief can be granted because it "ha[s] not alleged any reasons sufficient" to

show that the FEC's dismissal of the administrative complaint was "contrary to law."   Def.-

Intervenors' Am. MTD at 21.  Defendant-Intervenors also maintain that Plaintiffs' separate APA

claim is preempted by FECA.  The Court addresses each of these arguments in turn.

### A.  FECA (Count I)

The Amended Complaint alleges two ways in which the Commission's dismissal of

CLC's administrative complaint violate FECA.  Recall that this Court may find such a dismissal

to be "contrary to law" under 52 U.S.C. § 30109(a)(8)(C) only "if (1) the FEC dismissed the

complaint as a result of an impermissible interpretation of the Act, . . . or (2) if the FEC's

dismissal of the complaint, under a permissible interpretation of the statute, was arbitrary or

capricious, or an abuse of discretion."  Orloski, 795 F.2d at 161.  Plaintiffs here allege that the

dismissal violated both prongs of this test, and Defendant-Intervenors rejoin that both of these

allegations do not clear the pleadings bar of Federal Rule of Civil Procedure 12(b)(6).

     1. *Impermissible Interpretation*

HFA and CTR first argue that CLC has failed to state a claim that the FEC's dismissal of Plaintiffs' administrative complaint was based on "an impermissible interpretation of the Act." CLC, 952 F.3d at 357 (quoting Orloski, 795 F.2d at 161).  Specifically, they contend that the Statement of Reasons published by Commissioners Petersen and Hunter finding that the internet-communications exception covered all "production costs" related to unpaid online communications, see generally Petersen & Hunter SOR; *supra* Section I.B, was "legally and factually sound." Am. MTD at 22.  CLC counters that this "unbounded construction" of 11 C.F.R. § 109.21 "defies [FECA's] clear statutory language."  Pl. Opp. at 30.

Even conducting a "deferential inquiry" into whether a dismissal was contrary to law, CLC, 952 F.3d at 357, the Court believes that Plaintiffs' Amended Complaint passes the test. CLC has cast serious doubt on whether the controlling Commissioners' interpretation of the internet-communications exception was "'sufficiently reasonable' to be accepted by a reviewing court."  DSCC, 454 U.S. at 39 (quoting Train v. NRDC, 421 U.S. 60, 75 (1975)).  This is because that interpretation appears to (1) be inconsistent with FEC precedent, policy, and regulations; and (2) "unduly compromise[] the Act's purposes."  Orloski, 795 F.2d at 164; see DSCC, 454 U.S. at 37 (citing "consistency" as a "factor[] that bear[s] upon the amount of deference to be given [to] an agency's ruling").

First, the two Commissioners' interpretation of 11 C.F.R. § 109.21 would constitute a significant liberalization of campaign-finance law, notwithstanding Defendant-Intervenors' — and the SOR's — statements to the contrary.  See Am. MTD at 25–29; Petersen & Hunter SOR at 11 ("Consistent with Commission precedent, we concluded that Correct the Record's expenses for its online communications, including creation and production costs, are not in-kind

contributions to Hillary for America under the 'coordinated communication' standard at 11 C.F.R. § 109.21.").  The controlling Commissioners stated that "the Commission has repeatedly interpreted the internet exemption to encompass expenses incurred by a speaker to produce an internet communication."  Petersen & Hunter SOR at 12.  Their strongest example of an exemption of such "services necessary to make an Internet communication" was "$118,000 spent on email list rentals and contribution-processing fees" in connection with "email solicitations" for donations.  Id. at 12–13.

The difference between those "input costs" and the "creation and production costs" at issue in this case is one of kind and not of degree.  Here, CTR claimed that, "for example, computer equipment, office space, software, . . . video equipment . . . , and salaries for individuals to conduct internet activity (posting on social media and e-mailing journalists)," as well as "payment for the underlying polling" were all completely exempted from regulation because they were production costs of unpaid internet publications.  Id.  Many of these are far broader categories of expenses, and far less directly connected to a specific unpaid internet communication, than email-list rentals and donation-processing software purchased to enable email blasts.

In fact, when publishing the final rule exempting unpaid internet activity from the definition of a contribution or expenditure, "[t]he Commission note[d] that" the rule "does not exempt all political activity involving the use of technology from regulation."  71 Fed. Reg. 18,606.  Notably, the FEC then stated: "Therefore, for example, a political committee's purchase of computers for individuals to engage in Internet activities for the purpose of influencing a Federal election, remains an 'expenditure' by the political committee."  Id.  This comment suggests that the purchase of "video equipment" and "software" cannot be considered

an input cost of an unpaid internet communication.  And, as OGC noted, while "placing a poll

online" may be covered by the exemption, "payment for the underlying polling, made in

coordination with HFA as it appears all CTR activity was," stretches the idea of "input costs" to

the breaking point.  See OGC Reports at ECF p. 45 ("The fact that the polling results were

subsequently transmitted over the internet does not retroactively render the costs of the polling a

'communication' cost.") (citing FEC regulations, opinions, and guidance); see also Fed. Election

Commission, Campaign Guidance: Nonconnected Committees 25 (2008) ("[A] committee makes

an in-kind contribution when it . . . [p]ays for consulting, polling or printing services provided to

a candidate committee.").

Second, in addition to departing from Commission precedent and policy, the controlling

Commissioners' interpretation of the internet-communication exception creates a loophole that

effectively vitiates the plain language of FECA.  The Act explicitly includes within its reach

"expenditures made by any person in cooperation, consultation, or concert, with, or at the request

or suggestion of, a candidate, his authorized political committees, or their agents."  52 U.S.C.

§ 30116(a)(7)(B)(i); see 11 C.F.R. § 109.20(a) (same).  By doing so, it "prevent[s] attempts to

circumvent the Act through . . . disguised contributions."  Buckley, 424 U.S. at 47.  "Without a

coordination rule, politicians could evade contribution limits and other restrictions by having

donors finance campaign activity directly — say, paying for a TV ad or printing and distributing

posters."  Shays, 414 F.3d at 97.

Yet this is precisely what such an expansive definition of input costs would allow.  If any

cost can be exempted from campaign-finance regulation because it has some tangential effect

upon an unpaid internet communication, political committees could avoid reporting (and

therefore limiting) almost all coordinated expenditures merely by posting a message on

Facebook that purports to use some advantage conferred by the expenditure.  Or, to use an example from Plaintiffs' parade of horribles, this interpretation "would appear to permit a 'dark money' nonprofit, even one funded by foreign nationals, to mount an undisclosed $100 million public relations campaign in full coordination with the federal candidate it seeks to elect — avoiding the FEC's coordination rules on the pretext that some small portion of the effort will appear online."  Pl. Opp. at 45.  This Court cannot presume that the FEC, in promulgating the internet-communications exception, meant to lay waste to one of the central tenets of campaign-finance law.  See Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 468 (2001) ("Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions — it does not, one might say, hide elephants in mouseholes.") (citing MCI Telecomms. Corp. v. AT&T, 512 U.S. 218, 231 (1994); then citing FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 159–60 (2000)); see also Corley v. United States, 556 U.S. 303, 314 (2009) ("A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant . . . .") (alteration omitted) (omission in original) (quoting Hibbs v. Winn, 542 U.S. 88, 101 (2004).

The Court thus concludes that CLC has sufficiently stated a claim that the Commission's dismissal of its administrative complaint was "contrary to law" by impermissibly interpreting FECA.

### 2.  *Arbitrary, Capricious, or Abuse of Discretion*

The second way in which Plaintiffs allege that the Commission's dismissal of the administrative complaint was "contrary to law" is that it was "arbitrary or capricious, or an abuse of discretion," Common Cause, 108 F.3d at 415 (quoting Orloski, 795 F.2d at 156), because it ignored clear evidence of coordinated expenditures between HFA and CTR even apart from

those claimed to be exempt under the internet-communications regulation.  According to the

OGC report and Plaintiffs' Amended Complaint, and as shown in CTR's reporting, "the bulk of

CTR's reported disbursements" — nearly all of which were categorized by CTR as not being

contributions and therefore not subject to itemized reporting — "[we]re for purposes that are <u>not

communication-specific</u>, including payroll, salary, travel, lodging, meals, rent, fundraising

consulting, computers, digital software, domain services, email services, equipment, event

tickets, hardware, insurance, office supplies, parking, and shipping."  OGC Reports at ECF p. 10

(emphasis added); <u>see</u> Am. Compl., ¶ 90; <u>Disbursements</u> (Committee: Correct the Record, Time

Period: 2015-2016), Fed. Election Comm'n, https://www.fec.gov/data/disbursements/?data_

type=processed&committee_id=C00578997&two_year_transaction_period=2016 (last visited

June 4, 2020).  If, as OGC's investigation suggested, these expenditures were "coordinated"

within the meaning of that term under FECA, CTR would have illegally spent millions working

on behalf of Clinton's campaign.  <u>See</u> 52 U.S.C. § 30116(a)(7)(B)(i) (including in definition of

"contribution" those expenditures "made by any person in cooperation, consultation, or concert,

with, or at the request or suggestion of, a candidate, his authorized political committees, or their

agents"); <u>id.</u> § 30116(a)(1) (setting contribution limit at $2,000).  Defendant-Intervenors argue

that this contention, too, does not satisfy Rule 12(b)(6).

The Court cannot agree with Defendant-Intervenors that CLC has failed to state a claim

here.  An agency action is "arbitrary and capricious if the agency has . . . offered an explanation

for its decision that runs counter to the evidence before the agency," <u>State Farm</u>, 463 U.S. at 43,

and such would seem to be the case here.  The Commissioners' conclusion that there was no

"reason to believe" that "Correct the Record's expenditures for other activities" than those they

claimed under the internet exception were "in-kind contributions to Hillary for America" runs

contrary to uncontested evidence in at least two ways.  The Court begins by addressing the smaller and more straightforward of the two.

In its letter to the Commission responding to the administrative complaint, HFA asserted that op-eds written in support of Clinton by senior CTR personnel, see Admin. Compl., ¶¶ 57, 62, "f[e]ll under the 'media exemption'" of "11 C.F.R. § 100.73[, which] exempts from the definition of 'contribution' 'any cost incurred in covering or carrying a news story, commentary, or editorial.'"  ECF No. 26-3 (HFA Response to Administrative Complaint) at 7 (quoting 11 C.F.R. § 100.73).  But the media exemption, as OGC noted, is for the media.  See 11 C.F.R. § 100.73 ("Any cost incurred in covering or carrying a news story, commentary, or editorial by any broadcasting station (including a cable television operator, programmer or producer), Web site, newspaper, magazine, or other periodical publication, including any Internet or electronic publication, is not a contribution unless the facility is owned or controlled by any political party, political committee, or candidate . . . ."); OGC Reports at ECF pp. 24 n.78, 48 n.70, 68 n.63. While the controlling Commissioners acknowledged that HFA asserted that the media exemption applied to it, see Petersen & Hunter SOR at 4–5, they never addressed this mistake and consequent violation in their analysis.  That so seemingly clear a violation was ignored in the SOR suggests that its decision ran counter to the uncontested evidence before it.

Second, and more broadly, there was significant evidence, gathered by the Office of General Counsel, of extensive and "systematic[]" coordination between Hillary for America and Correct the Record, see OGC Reports at ECF p. 41, that the controlling Commissioners largely refused to address.  One early internal HFA memorandum proposed countering attacks on Clinton "through work of CTR and other allies," and another noted that, by having CTR pay a governor to work as a surrogate would allow HFA to "make sure her speaking and media

opportunities met our needs/requests."  Id. at ECF p. 37–38.  In a January 2016 email, someone

from HFA described "engag[ing] CTR" as part of an effort to "rally the troops to defend" an

anticipated attack.  Id. at ECF p. 38.  A CTR fundraiser, in an update sent to the HFA chairman,

described the structure of CTR as "allow[ing] CTR to retain its independence but coordinate

directly and strategically with the Hillary campaign."  Id. at ECF p. 39.

Even if the Court did not take into consideration the above information — which,

because it came from Russian military intelligence, Commissioners Petersen and Hunter rejected

as encouraging hacking, see Petersen & Hunter SOR at 3 n.4, 8 — there was ample evidence of

extensive coordination between HFA and CTR available in public statements.  In the press

release announcing the committee's creation, a CTR spokesperson described the super PAC as "a

strategic research and rapid response team designed to defend Hillary Clinton from right-wing

baseless attacks" and stated that the committee intended to "work in support of Hillary Clinton's

candidacy for President, aggressively responding to false attacks and misstatements."  OGC

Reports at ECF pp. 32–33.  The press release also stated that, because it would not be engaged in

"paid media," it would "be allowed to coordinate with campaigns and Party Committees."  Id. at

ECF p. 33.  CTR again stated a few days later that activity posted for free online could "be

legally coordinated with candidates and political parties," id., suggesting that it undertook many

of its activities "in cooperation, consultation, or concert, with, or at the request or suggestion of,

a candidate, his authorized political committees, or their agents."  52 U.S.C. § 30116(a)(7)(B)(i).

As further evidence, CTR chairman David Brock stated in an interview that "the

coordinated status was, you're basically under their thumb but you don't have to run everything

by them."  OGC Reports at ECF p. 36.  He elaborated that when, for example, he had raised an

issue in public before first consulting the Clinton campaign, he "took [his] lumps and then [he]

obeyed" after the HFA chairman tweeted that he should "chill out." Id.  On another occasion,

CTR changed its position on defending the Clinton Foundation after a discussion with an HFA

campaign manager: the reason, he stated, was that "we are a surrogate arm of the campaign and

you need the Campaign on board for this." Id. at ECF p. 36–37.  The Commissioners' statement

that this information was the result of "selective Google searches" and did not show that CTR

"fully coordinated its activities with Hillary for America," Petersen & Hunter SOR at 7, does not

support its choice to discount it in an analysis of whether any of the millions of dollars of

expenditures CTR reported might have been coordinated.

* * *

The Court, in sum, rejects Defendant-Intervenors' argument that Count I is facially

infirm, instead finding that it presents significant and largely uncontroverted evidence that the

Commission's dismissal of its administrative complaint was "contrary to law" under 52 U.S.C.

§ 30109(a)(8)(C) as interpreted by the D.C. Circuit.  This count thus survives.

B.  APA (Count II)

The second count in Plaintiffs' Amended Complaint asserts a claim under the

Administrative Procedure Act — as a cause of action rather than a standard of review.  Cf. supra

Section III.  CLC alleges that the internet-communications regulation, as interpreted by the

controlling Commissioners here, is inconsistent with both FECA and other FEC regulations and

is therefore "arbitrary, capricious, an abuse of discretion, and contrary to law."  Am. Compl.,

¶¶ 111–13 (citing 5 U.S.C. § 706(2)(A), (2)(C)).  Defendant-Intervenors argue that, because

"FECA provides an adequate remedy" for Plaintiffs' claim, this APA count "should be

dismissed."  Am. MTD at 18.

"Section 704 of the Administrative Procedure Act limits judicial review under that statute to agency actions 'for which there is no other adequate remedy in a court.'" Citizens for Responsibility and Ethics in Wash. v. DOJ, 846 F.3d 1235, 1238 (D.C. Cir. 2017) (quoting 5 U.S.C. § 704); see also Bowen v. Massachusetts, 487 U.S. 879, 903 (1988) ("When Congress enacted the APA to provide a general authorization for review of agency action in the district courts, it did not intend that general grant of jurisdiction to duplicate the previously established special statutory procedures relating to specific agencies."). "When considering whether an alternative remedy is 'adequate' and therefore preclusive of APA review, [courts] look for 'clear and convincing evidence' of 'legislative intent' to create a special, alternative remedy and thereby bar APA review." CREW, 846 F.3d at 1244 (quoting Garcia v. Vilsack, 563 F.3d 519, 523 (D.C. Cir. 2009)). "[W]here Congress has provided 'an independent cause of action or an alternative review procedure' in a purported alternative, [the D.C. Circuit] ha[s] found clear markers of legislative intent to preclude." Id. at 1245 (quoting El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. U.S. Dep't of Health & Human Servs., 396 F.3d 1265, 1270 (D.C. Cir. 2005)). "[T]he alternative remedy need not provide relief identical to relief under the APA," Garcia, 563 F.3d at 522, but instead only relief "of 'the same genre' as that available under the APA." El Rio, 396 F.3d at 1272 (citation omitted) (quoting Women's Equity Action League v. Cavazos, 906 F.2d 742, 751 (D.C. Cir. 1990)).

A court in this district has already found FECA's statutory scheme adequate within the meaning of § 704. "FECA itself indicates that the remedy it provides is sufficient to preclude APA review of the Commissioners' statements of reasons" by stating explicitly that the FEC has "'exclusive jurisdiction' over civil enforcement of campaign finance laws." Citizens for Responsibility and Ethics in Wash. v. FEC, 164 F. Supp. 3d 113, 119 (D.D.C. 2015) (quoting 52

U.S.C. § 30106(b)(1)).  "Because FECA includes a private cause of action, along with 'a detailed

mechanism for judicial consideration of particular issues at the behest of particular persons,' that

remedy is the exclusive means to enforce the Act."  Id. at 120 (quoting Stockman v. FEC, 138

F.3d 144, 154 (5th Cir. 1998)).

Plaintiffs counter that, while FECA does create a special review scheme, it does not

necessarily afford them an opportunity to challenge the validity of the internet-communications

regulation as interpreted by the controlling Commissioners.  That is, they argue that because "the

court might well uphold FEC non-enforcement without ever reaching the regulation's validity,"

Shays, 414 F.3d at 96, they may not be able to "obtain the relief [they] want[] under" FECA.

CREW, 846 F.3d at 1241.

Circuit precedent appears to support Plaintiffs' position.  While not in precisely this

circumstance, that court has stated that "FECA has no provisions governing judicial review of

regulations, so an action challenging its implementing regulations should be brought under the

judicial review provisions of the Administrative Procedure Act (APA)."  Perot v. FEC, 97 F.3d

553, 560 (D.C. Cir. 1996) (citation omitted).  In Shays, the Circuit more explicitly rejected the

idea that the FEC enforcement scheme was adequate to challenge the validity of a FECA

regulation.  414 F.3d at 96; see also Citizens for Responsibility and Ethics in Wash. v. FEC, 243

F.Supp.3d 91, 105 (D.D.C. 2017) (reading these cases to mean that plaintiffs challenging the

validity of FEC regulations may bring claims under the APA).

Yet CLC here is not challenging the regulation itself, but rather the Commissioners'

interpretation of it in connection with the specific facts in this case.  See Pl. Opp. at 5–6 ("These

regulations, at least as construed by the controlling group, are in direct conflict with FECA's

mandate to regulate coordinated expenditures as in-kind contributions.").  As a result, the Court's

analysis is likely to look very similar to the preceding discussion of whether that interpretation is "impermissible."  <u>See</u> *supra* Section IV.A.1.  If the Court determines at summary judgment that the controlling Commissioners' interpretation was indeed impermissible, it is not clear that the APA claim would remain justiciable.  <u>See</u> Pl. Opp. at 43 ("Plaintiffs' [*sic*] disagree with this characterization of the scope and purpose of the internet exemption.  But if intervenors' alternative narrative is accepted, and this construction of the coordination regulations deemed authoritative, . . . then the severe damage this administrative construction inflicts on FECA's comprehensive regime for regulating and requiring full disclosure of coordinated expenditures will occur not only in this matter, but in any coordinated expenditure case involving internet activity.").  Finding discretion the better part of valor here, the Court will not dismiss the APA claim yet, waiting to see how CLC fares at summary judgment on Count I.

## V.      Conclusion

For the foregoing reasons, the Court will deny Defendants' Motion to Dismiss.  A separate Order consistent with this Opinion shall issue this day.


/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  <u>June 4, 2020</u>