## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CAMPAIGN LEGAL CENTER, *et al.*,

Plaintiffs,

v.

FEDERAL ELECTION COMMISSION,

Defendant,

and

HILLARY FOR AMERICA, *et al*.,

Defendant-Intervenors.

Civil Action No. 19-2336 (JEB)

## MEMORANDUM OPINION

This case concerns a presidential election — just not the most recent one.  Instead, this campaign-finance dispute arises out of the 2016 contest.  Back in October of that year, Plaintiffs Campaign Legal Center, a watchdog group, and Catherine Hinckley Kelley, a registered voter, filed an administrative complaint with the Federal Election Commission alleging that Hillary Clinton's presidential campaign, Hillary for America (HFA), and a super PAC known as Correct the Record (CTR) violated the Federal Election Campaign Act by unlawfully coordinating on over $6 million of CTR's expenditures.  The Commission dismissed the complaint, and Plaintiffs filed this suit challenging that decision and asserting causes of action under both the FECA and the Administrative Procedure Act.  After the FEC fell one vote short of the four required to authorize its defense of this lawsuit, the Court permitted HFA and CTR to intervene as Defendants.  They then moved to dismiss, arguing, among other things, that Plaintiffs lacked

standing to sue.  The Court denied that Motion, and the parties have now filed Cross-Motions for

Summary Judgment.

Undaunted by this Court's initial ruling, HFA and CTR spend much of their Cross-

Motion renewing their contention that Plaintiffs have no standing to challenge the FEC's

dismissal of their administrative complaint.  Mindful of its ongoing obligation to police its

jurisdiction and heeding Alexander Pope's dictum that admitting error simply means that one is

wiser today than one was yesterday, the Court has reconsidered the standing issue.  It now

concludes that HFA and CTR urge the better reading of the law and that Plaintiffs do not have

standing to press their FECA count here.  The Court is thus without jurisdiction as to that claim

and must dismiss it.  The answer may be different as to Plaintiffs' APA claim, and the Court will

order further briefing on that issue.

## I.    Background

The Court assumes familiarity with its prior two Opinions in this case, Campaign Legal

Ctr. v. FEC, 334 F.R.D. 1, 3 (D.D.C. 2019) (CLC I); Campaign Legal Ctr. v. FEC, 466 F. Supp.

3d 141, 146 (D.D.C. 2020) (CLC II), but it will nonetheless relay the facts necessary to

understand the parties' standing arguments.

### A.  Legal Background

In an attempt to close a loophole that would enable easy evasion of its mandates,

campaign-finance law treats as "contributions" not only direct donations to a political candidate,

but also most expenditures "made by any person in cooperation, consultation, or concert, with, or

at the request or suggestion of" that candidate.  See 52 U.S.C. § 30116(a)(7)(B)(i); see also FEC

v. Colo. Republican Fed. Campaign Comm., 533 U.S. 431, 438 (2001) ("Expenditures

coordinated with a candidate . . . are contributions under the Act."); Buckley v. Valeo, 424 U.S.

1, 47 (1976) (this approach "prevent[s] attempts to circumvent the Act through . . . disguised contributions").  By definition, these so-called "coordinated expenditures" are in-kind — *viz.*, not actual cash — contributions to the candidate.  See CLC II, 466 F. Supp. 3d at 146.

The Act's treatment of coordinated expenditures as contributions carries two important regulatory consequences relevant here.  First, there are disclosure obligations.  A political-action committee like CTR must disclose the same information about an expenditure it coordinated with a campaign as it would disclose for a typical in-kind contribution to that campaign (*e.g.*, the provision of services), and a campaign must reveal the same information about an expenditure on which it coordinated as it would for a typical in-kind contribution it receives.  On both sides, that information comprises the name of the donor/recipient, the date, and the amount of the coordinated expenditure.  See 52 U.S.C. § 30104(b)(6)(B)(i) (PAC); id. § 30104(b)(3)(B) (campaign).  Further, both the expenditure maker and the campaign must also separately disclose the coordinated expenditure just as they would any other expenditure they made.  Id. §§ 30104(b)(5)(C), (b)(6)(B)(iii)–(v) (PAC); 11 C.F.R. §§ 104.13(a)(2), 109.20(b) (campaign). Note that the law treats the campaign itself as constructively making the expenditure, even though it did not actually do so, because it coordinated the expenditure with the actual spender. Each side's expenditure disclosure must include, in addition to the date and amount, the purpose of the expenditure.  See 11 C.F.R. §§ 104.3(a)(4)(ii), (b)(3)(i), (vii)–(ix) (PAC); id. §§ 104.3(b)(4)(i), (vi) (campaign).

Second, by virtue of qualifying as "contributions," coordinated expenditures are also subject to FECA's $2,700 contribution limit for PACs or individuals, as well as the Act's prohibition on using union or corporate funds for contributions to candidates.  See 52 U.S.C. § 30116(a)(1); id. §§ 30118(a), (b)(2).  In other words, a PAC such as CTR can make no more than

an aggregate of $2,700 in direct contributions and coordinated expenditures to a candidate, and it cannot use moneys raised from unions or corporations to fund any coordinated expenditure.

B.  This Case

In late October 2016, Plaintiffs brought an administrative complaint before the FEC alleging that CTR had made, and HFA had accepted, millions of dollars in coordinated expenditures, in gross violation of the applicable contribution limits and without properly disclosing those expenditures as in-kind contributions.  See ECF No. 15-1 (Administrative Complaint), ¶¶ 1–2.  The Commission eventually dismissed that complaint after splitting 2–2 on whether to find "reason to believe," 52 U.S.C. § 30109(a)(2), that any FECA violation had occurred.  See CLC II, 466 F. Supp. 3d at 149.  In August 2019, Plaintiffs brought this action challenging the dismissal as "contrary to law" under both FECA, 52 U.S.C. § 30109(a)(8), and the APA, 5 U.S.C. § 706(2).  See ECF No. 15 (Amended Complaint), ¶¶ 107, 113.

CTR and HFA do not dispute here, and did not dispute before the FEC, that CTR made millions in campaign-related expenditures.  Indeed, CTR has already disclosed the date, amount, purpose, and recipient of every single one of its expenditures, as it was required to do under FECA as a PAC.  See FEC, Correct the Record Spending, https://www.fec.gov/data/committee/ C00578997/?tab=spending (last visited December 1, 2020); 11 C.F.R. §§ 104.3(b)(3)(i), (vii)– (ix).  Defendants instead contend that the FEC was correct to dismiss the complaint against them because none of CTR's expenditures qualifies as "coordinated" with HFA under applicable FEC rules.  See ECF No. 38-1 (Def. MSJ) at 27, 36.

The parties' disagreements on the issue of coordination fall into two buckets.  The first relates to quantum of proof: for certain of CTR's expenditures, Plaintiffs and Defendants dispute whether there was enough evidence before the Commission to compel it to find "reason to

believe" that those expenditures were coordinated — Plaintiffs say yes, Defendants say no.  See
ECF No. 35 (Pl. MSJ) at 29–40; Def. MSJ at 36–42.  The second bucket involves a purely legal
dispute: as to many of CTR's other expenditures, Defendants do not contest that they were made
in concert with HFA, but nonetheless insist that they fall within an applicable regulatory
exemption known as the internet exemption, and are therefore not legally "coordinated."  See 11
C.F.R. § 109.21; CLC II, 466 F. Supp. 3d at 146.

Both parties advance these arguments in their latest Cross-Motions for Summary
Judgment, and the legal questions are undeniably intriguing.  Before tucking into them, however,
the Court must heed the "requirement that [its] jurisdiction be established as a threshold matter"
and consider, to that end, whether the "inflexible" requirements of Article III standing are met
here.  Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94 (1998) ("[T]he first and
fundamental question is that of jurisdiction . . . .  This question the court is bound to ask and
answer . . . .") (quoting Great Southern Fire Proof Hotel Co. v. Jones, 177 U.S. 449, 453 (1900)).
Defendants strenuously contend that the answer is no — that Plaintiffs lack a sufficient
"informational injury" under D.C. Circuit law because the details of CTR's expenditures are
already public record, and Plaintiffs have no cognizable interest in a further "legal
determination" from the FEC that such expenditures were coordinated with HFA.  See Def. MSJ
at 7–8; ECF No. 44 (Def. MSJ Reply) at 2.  After previously coming out the other way, the Court
now reverses field, at least as to Plaintiffs' FECA claim.  As to their APA claim, it requires
further briefing before resolving the matter.

II.     **Analysis**

A.  Injury-in-Fact

Standing is "a doctrine rooted in the traditional understanding of a case or controversy" in Article III of the Constitution.  Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016).  It requires, at a minimum, that a plaintiff show that she "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  Id.  The "injury in fact" must be both "(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical."  Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180 (2000).  An injury is "concrete" when it is "real, and not abstract," and "particularized" when it "affect[s] the plaintiff in a personal and individual way."  Spokeo, 136 S. Ct. at 1548 (quotation marks omitted).

The only injury-in-fact Plaintiffs have asserted here is an "informational injury" inflicted by the FEC's dismissal of their administrative complaint.  "[D]enial of access to information qualifies as an injury in fact where a statute (on the claimant['s] reading) requires that the information be publicly disclosed and there is no reason to doubt their claim that the information would help [it]."  Campaign Legal Ctr. v. FEC, 952 F.3d 352, 356 (D.C. Cir. 2020).  As to the statute at issue here, "[t]he Supreme Court has long recognized that FECA creates an informational right — the right to know who is spending money to influence elections, how much they are spending, and when they are spending it."  Citizens for Responsibility & Ethics in Wash v. Am. Action Network, 410 F. Supp. 3d 1, 12 (D.D.C. 2019) (citing FEC v. Akins, 524 U.S. 11, 24–25 (1998)).  But that is hardly the end of the matter because "the nature of the information allegedly withheld is critical to the standing analysis."  Common Cause v. FEC, 108 F.3d 413, 417 (D.C. Cir. 1997).  "Only if the statute grants plaintiff a concrete interest in the

information sought will he be able to assert an injury in fact." Nader v. FEC, 725 F.3d 226, 229

(D.C. Cir. 2013).

It is well settled that a plaintiff who "seek[s] information to facilitate his informed

participation in the political process" is concretely and particularly injured by the denial of that

information. Id. at 230; see, e.g., Akins, 524 U.S. at 21, 24–25. It is equally well established,

however, that a plaintiff's mere "desire for information concerning a violation of FECA" does

not give rise to an Article III injury-in-fact. Vroom v. FEC, 951 F. Supp. 2d 175, 179 (D.D.C.

2013); see also Common Cause, 108 F.3d at 418 (plaintiff cannot "establish injury in fact merely

by alleging that he has been deprived of the knowledge as to whether a violation of the law has

occurred"). That is because a plaintiff has no cognizable interest in "forc[ing] the FEC to 'get

the bad guys.'" Nader, 725 F.3d at 230 (quoting Common Cause, 108 F.3d at 418). "Ask[ing]

the FEC to compel information . . . in the hope of showing that [defendants] violated" the law

"amounts to seeking disclosure to promote law enforcement," and an injury to such law-

enforcement interest is merely a generalized grievance insufficient to confer standing. Id.; see

also Common Cause, 108 F.3d at 418 (no "justiciable interest in the enforcement of the law").

It follows, courts have explained, that a plaintiff's inability to procure from the agency a

"legal determination" or "legal conclusion that carries certain law enforcement consequences"

does not amount to informational injury. Citizens for Responsibility and Ethics in Wash. v.

FEC, 799 F. Supp. 2d 78, 88 (D.D.C. 2011) (quoting Wertheimer v. FEC, 268 F.3d 1070, 1075

(D.C. Cir. 2001)); see also Free Speech for People v. FEC, 442 F. Supp. 3d 335, 344–45 (D.D.C.

2020) (no informational injury where plaintiff seeks "an FEC investigation and a finding of an

election law violation," or a "legal determination whether the [campaign] violated FECA by

failing to [make certain] disclos[ures]"); Judicial Watch, Inc. v. FEC, 293 F. Supp. 2d 41, 47

(D.D.C. 2003) (same where what plaintiff was "really seeking [was] a legal determination by the Commission that [certain activities] represented contributions to [a] campaign, and that [the candidate's] failure to report those contributions is a violation of FECA").

These decisions dovetail nicely with the principle that a plaintiff lacks a cognizable informational injury where the information she seeks "is already required to be disclosed" elsewhere and, pursuant to that obligation, "reported in some form." Wertheimer, 268 F.3d at 1074–75. That is a giveaway that the plaintiff "do[es] not really seek additional facts[,] but only the legal determination that" the facts of which she is already aware amount to a legal violation. Id. at 1075. In other words, where "plaintiffs have all of the information they are entitled to pursuant to FECA," their coming to court anyway makes it "apparent that what they really want is a legal determination" they have no standing to seek. Alliance for Democracy v. FEC, 362 F. Supp. 2d 138, 148 (D.D.C. 2005); see id. at 149; Campaign Legal Ctr. v. FEC, 245 F. Supp. 3d 119, 125 (D.D.C. 2017) (no standing where "plaintiffs already possess all the relevant information about [certain] contributions"); Citizens for Responsibility, 799 F. Supp. 2d at 89 (plaintiffs' failure to "allege any specific factual information they lack that is not already publicly available" "reveal[ed] [that] what [they] [we]re actually seeking" was a legal conclusion); Judicial Watch, 293 F. Supp. 2d at 47 (concluding that plaintiff sought only a "legal determination" because it "appear[ed] unlikely that [his] administrative complaint [would] yield additional facts . . . that [he] was not already aware of").

B. Application

These precedents spell doom for Plaintiffs' standing here, which is premised on their desire to learn "which disbursements" made by CTR — all of which, recall, have already been publicly disclosed — "were made in coordination with HFA" and are thus by definition in-kind

contributions, and "which were made for non-coordinated or exempt activities."  ECF No. 42 (Pl.
MSJ Reply) at 7; see also id. at 8 (Plaintiffs "remain entirely in the dark about how much and
what portions of [CTR's] 3,516 disbursements in 2015–16 were in-kind contributions to a major
presidential campaign."); ECF No. 27 (Pl. MTD Opp.) at 15 ("[P]laintiffs . . . do not know which
activities were in fact coordinated between HFA and CTR, nor the extent to which any
disbursement by CTR constituted in whole or part an in-kind contribution to HFA.").  As noted
above, Plaintiffs, like any other "citizen who wants to learn the details of" CTR's disbursements,
can already find the amount, date, recipient, and purpose of every single one simply "by visiting
the Commission's website."  Citizens for Responsibility and Ethics in Wash. v. FEC, 475 F.3d
337, 339 (D.C. Cir. 2007) (finding no informational injury).  Plaintiffs nonetheless assert an
interest in finding out an additional piece of information not currently disclosed: which, if any, of
those expenditures, or which portions thereof, CTR made in coordination with HFA.  Binding
authority, however, establishes that they have no cognizable interest in learning "which activities
were in fact coordinated between HFA and CTR" or which of CTR's "disbursements" "were
made in coordination with HFA."  Pl. MSJ Reply at 7; Pl. MTD Opp. at 15.  In Wertheimer, the
main case in this obscure corner of standing law, the D.C. Circuit squarely held that a finding of
"coordination" does not amount to a "fact" that must be disclosed under FECA, but rather is a
"legal conclusion that carries certain law enforcement consequences."  268 F.3d at 1075; see 52
U.S.C. § 30109.  As a result, the Court of Appeals concluded, the plaintiffs had no standing to
seek such a finding.  Id.

That rule, which this Court's previous Opinion did not sufficiently take account of, is
dispositive here.  Plaintiffs seek a Commission determination that at least some of CTR's
expenditures were coordinated with HFA.  Much as that may sound like a factual determination

— *i.e.*, the campaign and PAC in fact coordinated — Wertheimer makes clear that it is a legal conclusion, carrying the law-enforcement consequences that CTR vastly exceeded the $2,700 contribution limit and improperly used union and corporate funds in doing so.  See 52 U.S.C. §§ 30109(a)(4)(C), (5)–(6), (d).  Because there is no "constitutionally cognizable" interest in procuring such a legal determination, the FEC's denial of Plaintiffs' request that the Commission investigate and make such a finding is insufficient to confer standing.  Wertheimer, 268 F.3d at 1074 (citing Common Cause, 108 F.3d at 417).

In addition to supplying the relevant rule of law, Wertheimer's facts are also instructive. The plaintiffs there alleged that President Bill Clinton had unlawfully coordinated with the Democratic National Committee on several of the DNC's expenditures, in violation of a complete statutory ban (triggered by participation in the now-outmoded public-financing scheme) on candidates' acceptance of outside contributions.  Id. at 1071–72.  The plaintiffs sought a declaration that coordinated expenditures by political parties amounted to in-kind contributions (which was not established law at the time).  Id. at 1071.  In response, the Court held that because "each transaction appellants allege[d] [was] illegal [was already] reported in some form" by the DNC, it was clear that plaintiffs "d[id] not really seek additional facts but only the legal determination that certain transactions constitute[d] coordinated expenditures."  Id. at 1075.  As a result, they "failed to establish that the ruling sought would yield anything more than a legal characterization or duplicative reporting of information that under existing rules is already required to be disclosed."  Id.  So too here.  Again, Plaintiffs already know the date, amount, recipient, and purpose of each of CTR's disbursements.  Their attempt to ascertain which of those disbursements were made in concert with HFA thus "does not really seek additional facts but only the legal determination" of coordination.  Id. at 1075; see also Citizens

for Responsibility, 799 F. Supp. 2d at 88–89 ("Much like 'coordination,' classifying a particular disbursement as an 'in-kind contribution' . . . carries certain law enforcement consequences" and adds no "specific factual information . . . not already publicly available . . . ."). They have no standing to sue to compel the Commission to make such a determination.

This may seem an unsatisfactory or counterintuitive result. One could be forgiven for thinking, as Plaintiffs appear to, that whether an expenditure was coordinated between a PAC and a campaign is a piece of information — regardless of its separate law-enforcement consequences — that citizens can also use to inform their participation in the political process. See Pl. MSJ Reply at 8–9. For instance, upon learning that a candidate and a PAC coordinated, an interested voter could choose to avoid supporting, financially or electorally, that candidate or other candidates who coordinate with that same PAC or its leaders in the future. Why should the deprivation of such a finding not constitute actionable informational injury?

Whatever the appeal of that line of thinking, it is precluded by a faithful reading of Wertheimer. In that case, counsel for the plaintiffs "was asked what facts, specifically, were not being disclosed" and "responded that the 'fact' of 'coordination' was being withheld." 268 F.3d at 1074–75. "But," the majority opinion immediately responded, "'coordination' appears to us to be a legal conclusion," not a piece of factual information giving rise to a cognizable interest in disclosure. Id. at 1075. For that reason, the Wertheimer court explained, the plaintiffs had "failed to show either that they [were] directly being deprived of any information or that the legal ruling they s[ought] might lead to additional factual information" "under the Akins test," id. at 1074 — the test asking whether the information "would help them . . . to evaluate candidates for public office." 524 U.S. at 21. The Court of Appeals thus squarely rejected the notion that

coordination constitutes a fact the denial of which harms a citizen's ability to evaluate a political candidate.

To be sure, Wertheimer did allow that it was "perhaps conceivable that certain facts are necessarily implied by the label 'coordinated.'" 268 F.3d at 1075. But it did not further elaborate on that bare aside, and at no point in this case have Plaintiffs ever explained what those "certain facts" would be, or why they would be "necessarily implied" here when they were not in Wertheimer. See Pl. MTD Opp. at 21 n.11 (asserting that "[t]his is . . . a case" where additional facts are implied, but not explaining why). Nor have Plaintiffs pointed to any case holding that a coordination finding is anything other than a legal determination insufficient to form the basis of an injury-in-fact. On the contrary, in a quite recent case, Judge Amit Mehta of this district rejected a plaintiff's attempt to evade Wertheimer even as it provided a set of facts that could be plausibly implied from a finding of coordination. See Free Speech for People, 442 F. Supp. 3d at 344. Specifically, the Free Speech plaintiff argued that a determination of coordination would necessarily imply that the candidate at issue "was aware of and/or had approved of the" expenditure, which was not public record. Id. In response, Judge Mehta explained that under Wertheimer, he could not accept the "[p]laintiff's effort to frame a legal determination (whether an in-kind contribution took place) as a factual one (whether the . . . [c]ampaign was aware of or approved the payment)." Id. Upon further examination, it seems to this Court that its previous Opinion did accept such an effort by Plaintiffs, crediting their desire to learn whether CTR and HFA coordinated as an attempt to obtain "full and accurate campaign-finance reporting." CLC II, 466 F. Supp. 3d at 152. The Court now agrees with Judge Mehta that such approach does not give Wertheimer or its progeny their due.

It is worth noting on this point that even if Plaintiffs had a cognizable interest in learning of coordination between HFA and CTR, there is ample evidence of such behavior already publicly available to them.  Using news reports and financial disclosures, Plaintiffs themselves "documented" before the Commission "how CTR spent millions . . . for the benefit of the Clinton campaign" and "noted that, by [CTR's] own admission, [it] did at least some portion of this in coordination with the campaign."  Am. Compl., ¶ 63.  As evidence for that assertion, Plaintiffs cited numerous public statements from CTR or its leaders to the effect that "there [were] no restrictions on its ability to coordinate with Mrs. Clinton's campaign," id., ¶ 65, and that it "work[ed] on what [it] call[ed] the 'coordinated' side of the Clinton campaign."  Admin. Compl., ¶ 24; see also id., ¶ 92 ("Correct the Record is reported as publicly acknowledging that it has coordinated [certain] activity with the Clinton campaign.").  Indeed, Plaintiffs have asserted in this lawsuit that "the public record makes clear that CTR and HFA coordinated" on at least "some activities that qualified as reportable in-kind contributions."  Pl. MTD Opp. at 16.  They cannot, then, seriously claim to be in the dark as to the relationship between CTR and HFA or unaware that CTR has made numerous coordinated expenditures on HFA's behalf.  Cf. Alliance for Democracy, 362 F. Supp. 2d at 145 (no standing to seek disclosure of dollar value of mailing list where "voluminous documents available on the [FEC's] website provide abundant raw data and numerous views of how that data could be analyzed to determine [the sought-after] value").

C.   Plaintiffs' Counterarguments

Plaintiffs nonetheless contend that while they know that some coordination did occur, they are in the dark as to its extent.  That, they maintain, is the "additional factual information" that they would learn if victorious here and that suffices for standing under Wertheimer.  See 268 F.3d at 1074.  Specifically, Plaintiffs assert that on their view of the law, they are entitled to

further disaggregation of many expenditures that CTR has so far disclosed only as "lump sum" expenses for items such as salary and payroll.  See Pl. MTD Opp. at 3; Pl. MSJ Reply at 7.  If, they argue, some portion of a disbursement helped support, or itself amounted to, a coordinated expenditure, then CTR should have broken out that portion as a separate line item (and HFA should have disclosed that portion as an in-kind contribution).  This additional disaggregation, Plaintiffs posit, would inform them and the public as to exactly what percentage of Defendants' activities was coordinated, which they suggest would be new factual information.

An example helps to illustrate.  CTR has already disclosed each biweekly salary payment it made to its founder and chairman David Brock.  See 466 F. Supp. 3d at 151 (citing ECF No. 27-4 (CTR Disbursements to David Brock)).  But in the "purpose" section of its disclosure of such payments, it simply stated that the expenditure was for "[s]alary."  CTR Disbursements to David Brock at 1.  Plaintiffs maintain that this disclosure is incomplete if, as they allege, at least some of CTR's activities were coordinated with HFA because then CTR (and HFA) should have disclosed at least some portion of Brock's salary — the portion supporting coordinated activities — as an in-kind contribution to HFA.  See Pl. MTD Opp. at 18.  Fully compliant disclosure would thus solve an ongoing "mystery" for Plaintiffs — viz., "the actual mix of coordinated and non-coordinated (or exempt) work that Brock performed in any given pay period."  Id.

While the Court previously indicated its agreement with this argument, see CLC II, 466 F. Supp. 3d at 151–52, it now regards it as an unpersuasive end-run around Wertheimer.  For one thing, a plaintiff armed with this theory could seemingly manufacture standing in nearly every conceivable case — trimming its sails and claiming only that some portion of a previously disclosed expenditure (or some subset of previously disclosed expenditures) should be treated as coordinated, and then asserting an interest not in knowing whether the expenditure(s) themselves

were coordinated (not okay), but in knowing what <u>proportion</u> of an entity's expenditures or activities were coordinated (okay). <u>Wertheimer</u> cannot admit of such an easy workaround.

More fundamentally still, Plaintiffs' theory does not avoid the <u>Wertheimer</u> rule even on its own terms. That is because the disaggregation Plaintiffs seek would not actually entail the disclosure of any information other than legal determinations of coordination as to some subset of already-disclosed expenditures — exactly the sort of information that Plaintiffs have no standing to learn. In other words, the revelation that some portion of a CTR disbursement qualifies as a coordinated expenditure would add nothing to the mix except the additional "fact" that the sub-expenditure was coordinated with HFA. Continuing with the example of Brock's salary, suppose that the Commission concluded, upon investigation, that 50% of his time in a particular two-week period was spent on coordinated activities, such that his salary payment of $4,521.56 should have been disclosed as one non-coordinated salary expenditure of $2,260.78 and one in-kind contribution of $2,260.78. Between that hypothetical world and the world as it stands now, the only new information would be that CTR paid for half of Brock's time, valued at $2,260.78, in coordination with the campaign. The new information, though, is nothing more than "the 'fact' of 'coordination,'" which under <u>Wertheimer</u> is not a fact at all but rather a legal conclusion that Plaintiffs have no cognizable interest in unearthing. And no other facts in which Plaintiffs have an Article III interest would be revealed; compared to the existing disclosure of $4,521.56, CTR and HFA's disclosures of a new $2,260.78 in-kind contribution and a $2,260.78 non-coordinated expenditure would reveal the same date, recipient, and, crucially, purpose of the disbursement: Brock's salary.

In earlier briefing, Plaintiffs attempted to wriggle out of this predicament by suggesting that the newly broken-out in-kind contribution would have to include a more granular purpose

description — something along the lines of "In-Kind Contribution: Media Training for

Surrogates," rather than merely "salary."  Pl. MTD Opp. at 19.  As Defendants point out,

however, Plaintiffs cited no authority for that proposition.  Nor have they ever "responded to

[Defendants'] [counter]argument" that no statute or regulation obligates disclosers to be more

specific when describing the purpose of an in-kind contribution than when disclosing a typical

expenditure.  See Def. MSJ Reply at 3–4.  As best the Court can tell, Defendants are correct that

there is no difference in the degree of specificity required.  Compare FEC, Instructions for FEC

Form 3X and Related Schedules 10, https://perma.cc/75WA-4YK9 (for in-kind contributions,

"item must be labeled 'contribution in-kind' and include the nature of the contribution (e.g.,

consulting, polling, etc.)"), with id. at 13 ("Examples of adequate descriptions [for disclosure of

expenditures] include the following: dinner expenses, media, salary, polling, travel, party fees,

phone banks, travel expenses and catering costs.").  Even if Plaintiffs are right, then, that

Defendants should have broken out and separately disclosed the coordinated portion of certain

previously disclosed expenditures, Defendants' purpose descriptions for those new expenditures

need not include any additional details.  For example, the hypothetical $2,260.78 in-kind

contribution of Brock's salary could have a disclosed purpose of "[s]alary," exactly the same as

the purpose description for the existing $4,521.56 expenditure.  See CTR Disbursements to

David Brock at 1.  The only additional information to be gleaned from comparing the new to the

old would be, as before, that 50% of Brock's salary for that pay period was coordinated.

Plaintiffs have no cognizable interest in obtaining that information.

        This Court's decision in Citizens for Responsibility supports this analysis.  See 799 F.

Supp. 2d at 87–89.  There, the plaintiffs alleged that a PAC's travel expenditures totaling

$10,243 amounted to in-kind contributions to a presidential campaign, in excess of the applicable

contribution limit of $5,000 and made without proper disclosure.  Id. at 82–83.  The plaintiffs

sued after the FEC declined to act on their administrative complaint, and this Court dismissed for

lack of standing under Wertheimer.  Id. at 88–89.  It explained that disclosures for the $10,243 in

disbursements were already "publicly available online."  Id. at 88.  The plaintiffs insisted that

they would nonetheless "learn [some]thing useful from knowing precisely which expenditures an

entity made and which contributions a candidate received" — in other words, how much of the

$10,243 amounted to an in-kind contribution and how much a distinct PAC expenditure.  Id. at

89; see also id. at 88 (plaintiffs, defendants, and FEC all had different views as to whether the

$10,243 "should be allocable between [the] PAC and the [campaign]," and, if so, what "[s]uch

an allocation" should be); Pl. MTD Opp. at 21 ("The only remaining question was a legal dispute

about how much of the $10,243 expenditure[s] should be considered a contribution to the

presidential campaign, and how much should be considered a non-contribution expenditure.").

Unmoved, this Court answered with essentially the same analysis it adopts here: failure to get a

portion of previously disclosed expenditures "reclassif[ied]" "simply does not constitute

informational injury."  799 F. Supp. 2d at 89.

Plaintiffs last contend that Wertheimer, Free Speech, Citizens for Responsibility, and the

several other decisions discussed above should not dictate the outcome here.  Those cases, they

argue, cannot seriously be read to "suggest that concealing up to $9 million of in-kind

contributions does not inflict informational injury."  Pl. MSJ Reply at 7.  And they point out

various factual differences they maintain are crucial — e.g., in Free Speech, "[t]he details of the

transaction in question . . . had also been confirmed by the Department of Justice's court filings

and admission of the respondents," and in Citizens for Responsibility, the "[p]laintiffs had all of

17

the information they sought because the FEC had conducted a full investigation of the factual circumstances of the [relevant] expense[s]." Id. at 7–8.

This position offers no succor. First, while the dollar amount of disputed election-related spending is admittedly quite high here, Plaintiffs supply no reason why Article III standing should turn on that fact. On the contrary, the general rule is that "[t]he size of the injury is irrelevant for the purposes of standing." Younger v. Turnage, 677 F. Supp. 16, 20 (D.D.C. 1988); see also Czyzewski v. Jevic Holding Corp., 137 S. Ct. 973, 984 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'"). Plaintiffs' claim to standing would founder whether they alleged that CTR and HFA coordinated $1.00 or $1 billion.

Next, as to the notion that "the details of" CTR's transactions at issue here have not been "confirmed" by a government agency or "admi[tted]" by Defendants, see Pl. MSJ Reply at 7–8, that is neither accurate nor "a material distinction." Free Speech, 442 F. Supp. 3d at 344 (rejecting "attempt[] to distinguish [that] case from Wertheimer by emphasizing that [certain entities] ha[d] disputed their involvement in [the] payment" at issue). The details of the relevant transactions here have already been disclosed, by Defendants, to the same extent they would be if Plaintiffs' suit were successful. And even if that were not so, Plaintiffs would still have no standing to seek those details as long as they were already public in some form, as they have no cognizable interest in "obtain[ing] publicly available information 'from a different source.'" Id. at 343 (quoting Wertheimer, 268 F.3d at 1075).

Finally, it is immaterial that the FEC has not conducted a further investigation here, as the informational-injury inquiry turns on the nature of the information that any such investigation would ultimately reveal. Where that information is simply a determination of coordination, as here, there is no standing to press for a further inquest. Id. (rejecting request for "FEC

investigation" and "determination . . . through an investigative process" the aim of which was to

secure a "legal determination that the respondents engaged in a coordinated scheme to violate

FECA"); Judicial Watch, 293 F. Supp. 2d at 47 (rejecting plaintiff's request for "information

resulting from a thorough and complete [FEC] investigation of [the] allegations" where "what

plaintiff desire[d]" was merely finding of legal violation and for the Commission to "get the bad

guys rather than disclose information") (cleaned up).

Consider in this regard the 2017 Campaign Legal Center decision, 245 F. Supp. 3d at

119, which illustrates this principle.  See Pl. MTD Opp. at 16.  In that case, the FEC had

dismissed five related administrative complaints all without any investigation.  Id. at 123.  In two

of the five, the plaintiffs sought only to "reclassify [certain] contributions [already] publicly

reported" as having been made not by the corporation listed on the initial disclosure, but rather

by the person controlling each corporation, each of whom had already admitted that he was the

true donor.  Id. at 125–26.  The Court held that the plaintiffs lacked standing to obtain that mere

"legal determination" under Wertheimer.  Id. at 126.  By contrast, as to the plaintiffs' three other

complaints, it was apparent from the record that neither the FEC nor the plaintiffs knew who was

truly behind the contributions at issue.  Id. at 126–27.  Because the plaintiffs had "a right to

truthful information regarding campaign contributions and expenditures" under Akins, the court

explained, they had suffered an informational injury that could be remedied by an FEC

investigation that would reveal those identities.  Id. at 127 (quotation omitted).  The rule sensibly

applied by the court, therefore, was that the Commission's failure to investigate confers standing

only if the sought-after inquiry would uncover nonpublic information that the plaintiffs have a

cognizable interest in obtaining: the identity of a contributor qualifies; the FEC's confirmation of

a fact already known to the public does not.  See Free Speech, 442 F. Supp. 3d at 345

(interpreting <u>Campaign Legal Center</u> the same way).  Here, whether an expenditure was "coordinated," as the reader surely knows by this point, falls on the wrong side of the line for Plaintiffs.  They have no cognizable interest in obtaining that legal determination, and they accordingly lack Article III standing to challenge the FEC's decision not to investigate or proceed with their administrative complaint here.

The Court is certainly cognizant that under the reasoning of its decision here, it is possible that <u>no</u> plaintiff would have standing to sue the FEC alleging campaign-finance violations by an entity that has already disclosed its expenditures, no matter how obvious or gross the violations.  While perhaps unwelcome as a matter of <u>policy</u>, such an outcome cannot affect the Court's weighing of its jurisdiction under Article III.  The consequences for good government, in any event, may not be as dire as they seem.  For one thing, the FEC can always act against campaign-finance scofflaws, either on its own initiative or upon a complaint from <u>any</u> person (regardless of whether that person would have standing to sue in federal court).  <u>See</u> 11 C.F.R. §§ 111.4(a), 111.8(a).  And even where the Commission is unwilling or unable to act, the foregoing standing analysis likely would not bar a suit alleging coordinated spending by an entity that does not already disclose its expenditures under separate FECA provisions — for example, an individual spender.

\* \* \*

One last nuance bears mention.  The above discussion is plainly applicable to Plaintiffs' claim under FECA, which seeks nothing more than an order directing the Commission to reverse its "dismissal of [P]laintiffs' administrative complaint."  Am. Compl., ¶ 107.  It is at least possible, however, that it does not apply foursquare to their APA claim.  Plaintiffs' position on this question is not entirely clear.  In earlier briefing, they suggested that this count rests on a

"broader informational injury" than their FECA count, presumably because, in their opinion, the Commissioners' announced view of the law could affect their right to disclosure outside the context of this particular administrative proceeding.  See Pl. MTD Opp. at 15 n.6.  In their summary-judgment papers, however, Plaintiffs seem to concede that their "standing to bring their APA claim . . . rests on the same theories of standing as the FECA claim."  Pl. MSJ Reply at 5.  Given the course of the litigation to this point, Plaintiffs have arguably not had a sufficient opportunity to brief the question of whether they have independent standing as to their APA claim even if this Court concludes (as it now does) that they lack standing on their FECA claim. The Court will therefore order the parties to submit short supplemental briefing on that question. They need not further address, though they may if they wish, the additional threshold question of whether Plaintiffs' APA claim is precluded by FECA.  See Def. MSJ at 43–45; Pl. MSJ at 42–43; Pl. MSJ Reply at 43–44.

## III.   Conclusion

As Judge Harry Edwards once explained in an opinion reconsidering and overruling an earlier decision:

> Once discovered, confessing error is relatively easy.   What is difficult is accepting the realization that, despite your best efforts, you may still fall prey to an error of judgment. . . .  I will take refuge in an aphorism of Justice Frankfurter: "Wisdom too often never comes, and so one ought not to reject it merely because it comes late."

Moldea v. New York Times Co., 22 F.3d 310, 311 (D.C. Cir. 1994) (quoting Henslee v. Union Planters Nat. Bank & Trust Co., 335 U.S. 595, 600 (1949) (Frankfurter, J., dissenting)).  Like Judge Edwards, then, this Court must confess error: despite its earlier holding, Plaintiffs do not have standing to bring their FECA claim here.  This claim, accordingly, must be dismissed.  That may not be the end of this case, however, as the Court will order further briefing on the question

of Plaintiffs' standing to bring their separate APA claim.  A contemporaneous Order so stating

will issue this day.

/s/ <em>James E. Boasberg</em><br>JAMES E. BOASBERG<br>United States District Judge

Date:  December 2, 2020