UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CAMPAIGN LEGAL CENTER and CATHERINE HINCKLEY KELLEY,<br><br>Plaintiffs,<br><br>v.<br><br>FEDERAL ELECTION COMMISSION,<br><br>Defendant,<br><br>and<br><br>HILLARY FOR AMERICA and CORRECT THE RECORD,<br><br>Defendant-Intervenors. | Civil Action No. 19-2336 (JEB) |

MEMORANDUM OPINION

2006 was a big year for the internet: Twitter began operations, Facebook announced the News Feed, and the Federal Election Commission promulgated a Final Rule known as the "internet exemption," which exempts online communications placed without a fee from certain campaign-finance restrictions. That exemption, if perhaps overshadowed by the former two developments, lies at the heart of this case.

Plaintiff Campaign Legal Center filed a complaint with the FEC in October 2016, alleging that Correct the Record, a super PAC that supported Hillary Clinton in the 2016 presidential election, had improperly used the internet exemption to justify not reporting millions of dollars' worth of in-kind contributions. By an evenly divided vote, however, the FEC

1

effectively sided with CTR and declined to investigate. Its naysayers concluded that the exemption protected some of CTR's activities and that the Commission lacked sufficient evidence that others were coordinated with the Clinton campaign. CLC responded with this lawsuit to challenge that determination, and both CLC and CTR (intervening on behalf of the short-staffed Commission) now cross-move for summary judgment. Finding the Commission's analysis flawed on both points, the Court will grant CLC's Motion and deny CTR's.

**I.   Background**

The legal, factual, and procedural background of this case has by now been covered thrice by this Court and once by the D.C. Circuit. Campaign Legal Ctr. v. FEC, 334 F.R.D. 1, 3–4 (D.D.C. 2019) (CLC I); Campaign Legal Ctr. v. FEC, 466 F. Supp. 3d 141, 146–50 (D.D.C. 2020) (CLC II); Campaign Legal Ctr. v. FEC, 507 F. Supp. 3d 79, 81–83 (D.D.C. 2020) (CLC III); Campaign Legal Ctr. v. FEC, 31 F.4th 781, 784–88 (D.C. Cir. 2022) (CLC IV). The Court assumes familiarity with that compendium and here offers just the highlights.

   A.   Legal Framework

Congress passed the Federal Election Campaign Act in 1971 to "remedy any actual or perceived corruption of the political process." FEC v. Akins, 524 U.S. 11, 14 (1998). As relevant here, the Act places various restrictions — amount limitations, disclosure requirements, and the like — on contributions to candidates. The term "contribution" under the Act is defined very broadly to include any "gift, . . . deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office." 52 U.S.C. § 30101(8)(A)(i). Non-monetary contributions, such as gifts of "staff time, office space, or other resources," are known as "in-kind" contributions. CLC IV, 31 F.4th at 784.

FEC regulations define a relevant subset of in-kind contributions: coordinated communications. See 11 C.F.R. § 109.21(a)–(b) (defining "coordinated communication" and treating as in-kind contribution). As elaborated in 11 C.F.R. § 109.21, a communication qualifies as a "coordinated communication," and so a type of in-kind contribution, if it is paid for by an entity other than the campaign, with the campaign's involvement or collaboration, and qualifies as one of certain types of public communications. See 11 C.F.R. § 109.21(a)–(d); Shays v. FEC, 414 F.3d 76, 98 (D.C. Cir. 2005). "Expenditures coordinated with a candidate . . . are contributions under the Act." FEC v. Colo. Republican Fed. Campaign Comm., 533 U.S. 431, 438 (2001). This structure is designed to "prevent attempts to circumvent the Act through prearranged or coordinated expenditures amounting to disguised contributions." Buckley v. Valeo, 424 U.S. 1, 47 (1976).

In a 2006 rulemaking, however, the FEC carved out a narrow exemption from the "coordinated communications" definition for unpaid internet communications — that is, "communications over the Internet . . . [not] placed for a fee on another person's Web site." 11 C.F.R. § 100.26; see Internet Communications, 71 Fed. Reg. 18589, 18593–95 (Apr. 12, 2006); see also 11 C.F.R. §§ 100.94(a), 100.155(a)(1) (providing that uncompensated internet activity does not constitute a contribution or an expenditure). This is the so-called "internet exemption," and it is at the crux of the dispute here. Its upshot is that unpaid internet communications, such as blog posts, do not count as in-kind contributions at all. In its explanation and justification for the rule, however, the Commission made clear that certain expenses related to unpaid communications could still themselves qualify as in-kind contributions. For instance, the Commission noted, "[A] political committee's purchase of computers for individuals to engage in [unpaid internet communications]" would still constitute an expenditure and so an in-kind

3

contribution if coordinated with a campaign — even if the ensuing unpaid internet activities conducted on that computer were exempt.  See 71 Fed. Reg. at 18606; see also 52 U.S.C. § 30116(a)(7)(B)(i); 11 C.F.R. § 109.20.  So, too, with staff salaries.  The Commission explained that "if a political committee pays a blogger to write a message and post it within his or her blog entry," that salary payment would similarly (if coordinated) constitute an in-kind contribution — even if the blog post itself would not.  See 71 Fed. Reg. at 18604–05.  In other words, the Commission made clear the unremarkable conclusion that the internet exemption covers only unpaid internet communications themselves, and not all offline inputs to those communications.

FECA also sets out a specific scheme for enforcement of its provisions.  Under the Act, any person who believes that a violation has occurred may file a complaint with the Commission. See 52 U.S.C. § 30109(a)(1).  The FEC's Office of General Counsel reviews the complaint and any response and recommends to the Commission whether there is "reason to believe" a violation has occurred.  Id. § 30109(a)(2), (3).  The FEC Commissioners — six total, half from each of the two major political parties — then vote on whether there is "reason to believe" the Act was violated.  Id. §§ 30106(a)(1), 30109(a)(2).  If at least four Commissioners vote yes, the Commission will investigate; otherwise, the complaint may not go forward.  Id. §§ 30106(c), 30109(a)(2).  If they deadlock, the "declining-to-go-ahead" Commissioners — who are the "controlling" Commissioners — must issue a Statement of Reasons, which provides a basis for judicial review.  Common Cause v. FEC, 842 F.2d 436, 449 (D.C. Cir. 1988).  "Any party aggrieved" by the dismissal of a complaint may then seek such review.  See 52 U.S.C. § 30109(a)(8)(A).

4

B.  Factual Background

The Super PAC Correct the Record was conceived and organized specifically to press the limits of the internet exemption.  See Matea Gold, How a super PAC plans to coordinate directly with Hillary Clinton's campaign, Wash. Post (May 12, 2015), https://www.washingtonpost.com/news/post-politics/wp/2015/05/12/how-a-super-pac-plans-to-coordinate-directly-with-hillary-clintons-campaign/ [https://perma.cc/AM7A-L9SX]), cited in ECF No. 43 (Joint Appendix) at 78–79, OGC Report at 7–8.  Its activities, according to Plaintiffs' administrative complaint (and which Defendant-Intervenors do not dispute), included: producing voluminous digital content, conducting press outreach, staffing a "30-person war room" during Secretary Clinton's appearance before the House Select Committee on Benghazi, commissioning private polling about the campaign, training campaign surrogates and arranging their travel, sending "trackers" to record Clinton's opponents at events, and more.  See OGC Report at 10–11 (JA 81–82).

Plaintiff Campaign Legal Center is a non-profit campaign-finance watchdog group.  CLC II, 466 F. Supp. 3d at 148.  CLC filed an administrative complaint with the FEC in October 2016.  Id.  Catherine Hinckley Kelley, a director at CLC and a registered voter, later joined as a Plaintiff in this suit.  Id.  CLC alleged that CTR had coordinated the aforementioned activities, which had millions of dollars in value, with the Clinton campaign (known as Hillary for America) — and did so without properly disclosing those expenditures as in-kind contributions and in gross violation of FECA's contribution limits.  See OGC Report at 4–6 (JA 75–76); see also generally Administrative Complaint dated Oct. 6, 2016 (JA 3–54).  In response, CTR argued that this spending qualified for the internet exemption because the items it purchased were inputs to CTR's unpaid online communications.  See CTR Letter dated Jan. 24, 2017 (JA 62–71).

(CTR also contended that some spending fell within a separate exemption not relevant here. Id.) CTR did not dispute that its activities, and in particular its polling, surrogate training, and other offline activities, were coordinated with HFA. Id.

FEC's Office of General Counsel investigated the allegations and issued a report recommending that the Commission find reason to believe that several violations had occurred. See OGC Report at 27–28 (JA 98–99). Specifically, OGC concluded that CTR had "systematically coordinated with HFA on its activities," id. at 16 (JA 87), that the bulk of CTR's spending "cannot fairly be described as for 'communications' . . . unless that term covers every conceivable political activity," id. at 20 (JA 91), and that most of CTR's activities thus are not themselves communications at all but rather in-kind contributions to HFA. Id. at 22 (JA 93).

By a 2-2 vote, however, the deadlocked Commission (with two vacancies) rejected OGC's recommendation and dismissed the administrative complaint without further action. See Controlling Commissioners' Statement of Reasons, JA 226–43. The controlling and dissenting Commissioners each wrote a Statement of Reasons to explain their views. First, the controlling Commissioners concluded that "input costs" to online communications "are treated as in-kind contributions only when the internet communication itself is an in-kind contribution." Id. at 12 (JA 237). Because CTR's online polling, staffed war room, and the rest all resulted in unpaid internet communications, those expenses themselves were thus not in-kind contributions. Id. at 12–13 (JA 237–38). In the controlling Commissioners' view, this is a "bright-line rule." Id. at 13 (JA 238). Second, the controlling Commissioners concluded that insufficient record evidence indicated that CTR had coordinated with HFA on non-communications activities, such as CTR's surrogacy program, research and tracking, and contacts with reporters. Id. at 14–17 (JA 239–42). They accordingly declined to proceed with an investigation.

6

The dissenting Commissioners disagreed on both fronts. They first emphasized that the standard for opening an FEC investigation is very low: the Commission needs only a "reason to believe" that a violation has occurred. See Dissenting Commissioners' Statement of Reasons at 4 (JA 247). Here, the dissenters emphasized, the Commission's first holding impermissibly broadened the internet exemption, and its second ignored extensive evidence of off-the-internet coordination. Id. at 5–11 (JA 248–54). The dissenting Commissioners accordingly would have investigated CTR for possible campaign-finance violations.

C. Procedural History

In August 2019, CLC and Kelley filed this action challenging the FEC's dismissal order under 52 U.S.C. § 30109(a)(8). See ECF No. 1 (Complaint) at 22–23; see also ECF No. 15 (Amended Compl.). Plaintiffs asked the Court to declare that the Commission's dismissal was contrary to law and to remand the matter to the Commission for a reconsideration of its decision. See Amended Compl. at 29–30. The FEC failed to garner the four affirmative votes required by 52 U.S.C. §§ 30106(c) and 30107(a)(6) to defend this civil suit. CLC I, 334 F.R.D. at 4–5. Notwithstanding the Commission's apparent default, this Court permitted HFA and CTR to intervene as Defendants in November 2019 over Plaintiffs' objection. Id. at 5–7. (The Court will refer to Defendant-Intervenors jointly as CTR or Defendants.) Defendants then moved to dismiss the Amended Complaint, arguing that Plaintiffs lacked standing and had failed to state a claim under Rule 12(b)(6). The Court rejected both arguments, holding that CLC had standing to seek additional information from CTR and had pled facts that plausibly stated a claim against the FEC. CLC II, 466 F. Supp. 3d at 154, 162.

On motions for summary judgment, however, the Court "reverse[d] field" and held that Plaintiffs in fact did lack standing. CLC III, 507 F. Supp. 3d at 82. The Court explained that its

7

prior opinion had "not sufficiently take[n] account of" the Circuit's decision in Wertheimer v. FEC, 268 F.3d 1070 (D.C. Cir. 2001). CLC III, 507 F. Supp. 3d at 85. Under that case, a plaintiff lacks a cognizable informational injury where "the plaintiff 'do[es] not really seek additional facts[,] but only the legal determination that' the facts of which she is already aware amount to a legal violation." Id. at 84 (alterations in original) (quoting Wertheimer, 268 F.3d at 1075). The Court accordingly concluded that the information Plaintiffs seek "would not actually entail the disclosure of any information other than legal determinations of coordination" and therefore did not support informational standing. Id. at 88. The Court separately dismissed CLC's Administrative Procedure Act claim as precluded by FECA. See ECF No. 53 (Mem. Op. of Feb. 12, 2021, dismissing APA count).

Earlier this year, however, the D.C. Circuit reversed this Court's standing analysis. It concluded that Plaintiffs have standing because they seek the additional "factual information" of what proportion of CTR's spending constitutes coordinated contributions. CLC IV, 31 F.4th at 783. In so doing, that court took a different view of whether this type of information, about whether certain campaign spending is legally categorized as coordinated or not, constitutes a "fact" or a "legal conclusion" under Wertheimer. Finding "no doubt" that such information constitutes facts (albeit not really grappling with this Court's contrary analysis), the Circuit held Plaintiffs have standing to pursue their FECA challenges. Id. at 791–93. With the case now back in the district court, both sides have again cross-moved for summary judgment on CLC's two live FECA counts. See ECF Nos. 61 (CTR MSJ), 62 (CLC MSJ).

**II.     Legal Standard**

The legal question for a court reviewing the FEC's decision to dismiss an administrative complaint is whether that dismissal was "contrary to law." 52 U.S.C. § 30109(a)(8)(C). "The

FEC's decision is 'contrary to law' if (1) the FEC dismissed the complaint as a result of an impermissible interpretation of the Act . . . or (2) if the FEC's dismissal of the complaint, under a permissible interpretation of the statute, was arbitrary or capricious . . . ." Orloski v. FEC, 795 F.2d 156, 161 (D.C. Cir. 1986); see also CLC & Democracy 21 v. FEC, 952 F.3d 352, 357 (D.C. Cir. 2020).

With respect to the first of those two Orloski grounds, the Court's task is "not to interpret the statute as it th[inks] best," but rather to ask whether the Commission's interpretation is "sufficiently reasonable to be accepted by a reviewing court." FEC v. Democratic Senatorial Campaign Comm., 454 U.S. 27, 39 (1981) (internal quotations omitted); see also CLC, 952 F.3d at 357 (same). With respect to the second, the Court applies the arbitrary-and-capricious standard of review provided by the APA. See 5 U.S.C. § 706(2)(A). As administrative-law practitioners well know, agency action is arbitrary and capricious if the Commission "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). "'The scope of review [in an APA case] is narrow and a court is not to substitute its judgment for that of the agency,' provided the agency has 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" Airmotive Eng'g Corp. v. FAA, 882 F.3d 1157, 1159 (D.C. Cir. 2018) (second and third alterations in original) (quoting State Farm, 463 U.S. at 43).

9

### III. Analysis

Plaintiffs challenge the Commission's dismissal under both prongs of Orloski. First, they reject its analysis of the internet exemption as contrary to law; second, they describe its conclusions about CTR's offline activities as arbitrary and capricious. In addition to resisting these positions, CTR also adds what it characterizes as a standing argument, contending that any injury to CLC is no longer redressable.

For narrative cohesion the Court begins with CLC's merits challenges and then considers (and rejects) CTR's standing contention. On the merits, it sides with Plaintiffs on both Orloski bases. The Commission's opinion was doubly flawed: first because it failed to define any limits on when "inputs" to online exempted communications themselves become offline in-kind contributions, and second because its analysis of CTR's offline activities flagrantly disregarded key pieces of evidence.

#### A. Impermissible Interpretation

CLC first contends that the FEC's opinion constituted an "impermissible interpretation" of FECA. Orloski, 795 F.2d at 161. It emphasizes that the Act defines "contributions" and "expenditures" broadly and makes clear that contributions or expenditures made in concert with a candidate shall be reportable. See CLC MSJ at 12–21 (citing 52 U.S.C. § 30101(8)(A)(i), (9)(A)(i)). As for the internet exemption, Plaintiffs argue that CTR's expenditures were not on communications at all. They were instead on things like polling, computers, and staff time — which ultimately became "inputs" to communications, but were not themselves communications or sufficiently direct components of communications to be exempt.

The Court agrees. To state the obvious: the Commission's opinion would create a loophole in the internet exemption through which a truck could drive. Its self-described "bright-

line rule" excluding from regulation any input to an unpaid online communication would seemingly allow any coordinated expenditure to escape treatment as a contribution, so long as that expenditure somehow informs a blog post or improves a tweet. This massive expansion of the exception that essentially swallows the rule cannot stand for at least two reasons.

First, the Commission's decision contravenes FECA's plain language. See CLC II, 466 F. Supp. 3d at 157–58. As this Court has explained, the Act explicitly defines expenditures to include "anything of value," 52 U.S.C. § 30101(9)(A)(i), and includes as regulated contributions "expenditures made by any person in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents." Id. § 30116(a)(7)(B)(i); see 11 C.F.R. § 109.20(a) (same). By doing so, the statutory scheme "prevent[s] attempts to circumvent the Act through . . . disguised contributions." Buckley, 424 U.S. at 47. "Without a coordination rule, politicians could evade contribution limits and other restrictions by having donors finance campaign activity directly — say, paying for a TV ad or printing and distributing posters." Shays, 414 F.3d at 97; see also CLC II, 466 F. Supp. 3d at 158.

To comply with that statutory language, the internet exemption must be meaningfully bounded. Otherwise, as the Court has written, political committees could avoid reporting (and therefore limiting) almost any coordinated expenditure merely by posting a message on Facebook that purports to rely on that expenditure as an "input cost" to the post. CLC II, 466 F. Supp. 3d at 158. The controlling Commissioners' own explanation all but concedes that this is the world their approach puts us in. See Controlling Statement of Reasons at 13 (JA 238) (committing to "bright-line rule" that all "input costs" to unpaid internet communications, no matter scale or remoteness, qualify for exception). That approach cannot be squared with the

11

clear text, not to mention the clear purpose, of the statute. See 52 U.S.C. § 30101(8)(A)(i), (9)(A)(i); see also Buckley v. Valeo, 424 U.S. at 47.

Perhaps appreciating these weaknesses, CTR spends much of its briefing supplementing the Commission's reasoning with *post hoc* justifications. It suggests that the Commission's interpretation has not resulted in widespread abuse, that other regulatory provisions can check the worst abuses, and that First Amendment considerations favor its approach. See CTR MSJ at 10–12. But these are not justifications that the Commission offered in its Statement of Reasons (beyond an entirely threadbare reference to the First Amendment), and "an agency's action must be upheld, if at all, on the basis articulated by the agency itself." State Farm, 463 U.S. at 50; see also SEC v. Chenery Corp., 332 U.S. 194, 196 (1947) (courts "judge the propriety of [an agency's] action solely by the grounds invoked by the agency"). That principle rings particularly true here given that an intervenor, not even the Commission itself, is the one offering these arguments on the Commission's behalf. See CLC MSJ at 18.

Second, the controlling Commissioners' anything-goes approach is inconsistent with Commission precedent. When publishing the Final Rule exempting unpaid internet activity from the definition of a contribution or expenditure, "[t]he Commission note[d] that" the Rule "does not exempt all political activity involving the use of technology from regulation." 71 Fed. Reg. at 18,606. Importantly, the FEC there explained: "Therefore, for example, a political committee's purchase of computers for individuals to engage in Internet activities for the purpose of influencing a Federal election, remains an 'expenditure' by the political committee." Id. Expenditures, as discussed above, are treated as contributions where they are coordinated with a campaign committee. See Colo. Republican Fed. Campaign Comm., 533 U.S. at 438.

12

The FEC thus made clear in its original rulemaking that inputs to unpaid online communications can themselves still be in-kind contributions.

The Commission here bucked that commonsense approach. Most objectionably, it considered polling services, which it has long treated as "an in-kind contribution," just the way that the 2006 Rule instructed it not to. See CLC II, 466 F. Supp. 3d at 158 (quoting Fed. Election Commission, Campaign Guidance: Nonconnected Committees 25 (2008), https://www.fec.gov/resources/cms-content/documents/nongui.pdf [https://perma.cc/53DN-C52H]). Indeed, the FEC's own OGC had emphasized in its 2018 report that "placing poll results on [CTR]'s own website" may be covered by the internet exemption, but that "payment for the underlying polling" would not be. See OGC Report at 20 (JA 91); see also id. ("The fact that the polling results were subsequently transmitted over the internet does not retroactively render the costs of the polling a 'communication' cost."). This coordinated expenditure is virtually indistinguishable from the computer example in the 2006 Rule. In other words, substitute "polling" for "computers" as the relevant in-kind contribution and the Rule resolves this case — but the opposite way from how the controlling Commissioners did. Similarly, the controlling Commissioners treated the purchase of "video equipment" and "software" as non-expenditures falling within the internet exemption, notwithstanding the fact that (just like the hypothetical computers) both sets of equipment can just as easily be used to produce paid versus unpaid communications and are not exempt just because of their connection to an unpaid communication. The controlling Commissioners' analysis thus without explanation flew in the face of the examples and reasoning the Commission had itself offered when promulgating the rule.

13

CTR rejoins that the Commission's approach appropriately follows from a prior 2013 FEC decision. There, the Commission had concluded that a PAC's payment of $118,000 for "email list rentals and contribution-processing fees" in connection with "email solicitations" for donations fell within the internet exemption. See Controlling Statement of Reasons at 13 (JA 238) (citing MUR 6657 (Akin for Senate)). As this Court previously held, however, "The difference between those 'input costs' and the 'creation and production costs' at issue in this case is one of kind and not of degree." CLC II, 466 F. Supp. 3d at 157. The exemptions that the Commission permitted here "are far broader categories of expenses, and far less directly connected to a specific unpaid internet communication, than email-list rentals and donation-processing software purchased to enable email blasts." Id. Indeed, if anything, the Commission's email-list case illustrates the vast gulf between narrow, direct-communications inputs and the wholesale coordinated-communications operation CTR ran here. The Commission's failure to distinguish these categorically different operations undermines its precedent.

Because the Commission's expansion of the internet exemption would thus swallow both the statute and the regulation, the Court holds that it is contrary to law and thus invalid under Orloski's first prong. The Court leaves the task of defining the exemption's precise parameters to the expert agency, so long as it is consistent with the principles expressed here.

B.  Arbitrary and Capricious

CLC also challenges the second half of the Commission's opinion as arbitrary and capricious, arguing that it disregarded evidence that various offline activities (that undisputedly did not qualify for the internet exemption) were coordinated with the Clinton campaign. See Orloski, 795 F.2d at 161. Here, too, the Court agrees with Plaintiffs.

14

The Commission's Office of General Counsel documented substantial evidence, both leaked and public, of systematic coordination between HFA and CTR — evidence that the controlling Commissioners largely (and unreasonably) ignored.  The Court highlights just some illustrative examples.  One early internal HFA memorandum proposed countering attacks on Clinton "through work of CTR and other allies," and another noted that having CTR pay a governor to work as a surrogate would allow HFA to "make sure her speaking and media opportunities met our needs/requests."  OGC Report at 12–13 (JA 83–84).  In a January 2016 email, someone from HFA described "engag[ing] CTR" as part of an effort to "rally the troops to defend" an anticipated attack.  Id. at 13 (JA 84).  A CTR fundraiser, in an update sent to the HFA chairman, described the structure of CTR as "allow[ing] CTR to retain its independence but coordinate directly and strategically with the Hillary campaign."  Id. at 14 (JA 85).  And so forth. See generally CLC II, 466 F. Supp. 3d at 16 (discussing these examples).

Even setting aside internal campaign documents as the fruits of a poisoned Wikileaks cache, moreover, OGC documented ample public information that was more than sufficient to support opening an investigation.  Again, only a sampling suffices to make the point.  In the press release announcing its creation, a CTR spokesperson described the super PAC as "a strategic research and rapid response team designed to defend Hillary Clinton from right-wing baseless attacks" and stated that the committee intended to "work in support of Hillary Clinton's candidacy for President, aggressively responding to false attacks and misstatements."  OGC Report at 8–9 (JA 79–80).  So far, so good.  But the press release also stated that, because CTR would not be engaged in "paid media," it would "be allowed to coordinate with campaigns and Party Committees."  Id. at 8 (JA 79).  CTR again stated a few days later that activity posted for free online could "be legally coordinated with candidates and political parties," id., suggesting

15

that it undertook many of its activities "in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents." 52 U.S.C. § 30116(a)(7)(B)(i).

As further evidence, CTR chairman David Brock stated in an interview that "the coordinated status was, you're basically under their thumb but you don't have to run everything by them." OGC Report at 11 (JA 82). He elaborated that when, for example, he had raised an issue in public before first consulting the Clinton campaign, he "took [his] lumps and then [he] obeyed" after the HFA chairman tweeted that he should "chill out." Id. On another occasion, CTR changed its position on defending the Clinton Foundation after a discussion with an HFA campaign manager. The reason, Brock stated, was that "we are a surrogate arm of the campaign and you need the campaign on board for this." Id. at 12 (JA 83). Indeed, perhaps recognizing the overwhelming evidence of coordination, CTR did not even deny before the Commission that it had systematically coordinated with the Clinton campaign. See CTR letter dated Jan. 24, 2017 (JA 62–71).

The controlling Commissioners' failure to engage with these facts was arbitrary and capricious. They did not meaningfully consider these broad statements of intent to coordinate and instead looked for "transaction-by-transaction" evidence of coordination. See Controlling Statement of Reasons at 16 (JA 241). That approach ignored CTR's entire *raison d'être*. In view of CTR's statements, the Commission could have found individual activities independent had it identified evidence that, for instance, those activities were walled off from the organization's otherwise coordinated work. But the Commission did not do so. It instead looked at the record piecemeal and in so doing ignored the overwhelming and public evidence that the organization's entire purpose was top-to-bottom coordination with the Clinton campaign.

That approach was all the more arbitrary given what a low bar the reason-to-believe standard represents. As the dissenting Commissioners observe, the standard does not require "conclusive evidence" that a violation occurred or even "evidence supporting probable cause" for finding a violation. See Dissenting Statement of Reasons at 4 (JA 247). Instead, the Commission here needed "only a credible allegation that coordinated activity yielded an impermissible contribution." Id. That it had. The Commissioners nitpicked around the margins, arguing that OGC's conclusions about coordination were the result of "selective Google searches" and did not show that CTR "fully coordinated its activities with Hillary for America." SOR at 7 (JA 232). Even if all that were true, it would not support the Commission's rejection of credible allegations that at least some of the millions of dollars of expenditures CTR reported were coordinated such that investigation was warranted. The Commission's blinkered view of the record is thus particularly erroneous given the very low evidentiary bar that CLC needed to clear, rendering its analysis arbitrary and capricious under Orloski's second prong.

    C.  Standing and Mootness

Merits concluded, the Court now wends its way back to CTR's standing challenge, which boils down to this: Plaintiffs' injury is no longer redressable because (1) the FEC "most likely" would dismiss the matter because of FECA's five-year statute of limitations, see CTR MSJ at 20, and (2) today, half a decade after the 2016 election, CTR would probably be unable to reconstruct much of the reporting information CLC seeks. Id. at 26.

Neither of these arguments bears fruit. To begin, CTR's assertion really concerns mootness, not standing. That is apparent from the silence in its Reply after CLC pointed this out. See ECF No. 64 (CTR Reply) at 15–18. That concession aside, CTR's contention is that the injury is "no longer redressable," not that it never was. See CTR MSJ at 2. Indeed, the D.C.

17

Circuit has just held in this very case that Plaintiffs have standing. CLC IV, 31 F.4th at 783. And nothing has changed between the Circuit's ruling and today. As Plaintiffs note, both the statute-of-limitations issue and the evidence-decay issue that CTR now discusses could have been raised in primary or supplemental briefing before the Circuit. See ECF No. 65 (CLC Reply) at 11 n.3. CTR's new argument, then, is best viewed as contending that the case has become moot over time.

"[W]here litigation poses a live controversy when filed," it is "mootness doctrine" that "requires a federal court to refrain from deciding it if events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." LaRoque v. Holder, 679 F.3d 905, 907 (D.C. Cir. 2012) (alteration and citation omitted). "The initial 'heavy burden' of establishing mootness lies with the party asserting a case is moot." Honeywell Int'l, Inc. v. Nuclear Regul. Comm'n, 628 F.3d 568, 576 (D.C. Cir. 2010).

This CTR has not borne. First, it has not shown that the 28 U.S.C. § 2462 statute of limitations bars relief in this case. That is so for several reasons. To begin, CLC is correct that § 2462 likely does not preclude equitable relief — or at least that CTR has not carried its burden to establish the contrary. See, e.g., FEC v. Nat'l Republican Senatorial Comm., 877 F. Supp. 15, 20-21 (D.D.C. 1995) ("[I]t is well settled that '[t]raditionally and for good reasons, statutes of limitation are not controlling measures of equitable relief,'" and "the explicit language of § 2462" in particular "only refers to 'enforcement of any civil fine, penalty or forfeiture.'") (quoting Holmberg v. Armbrecht, 327 U.S. 392, 396 (1946)). The relief sought here — producing reports of undisclosed in-kind contributions — is thus likely a permissible equitable remedy. Second, CTR has shown no reason why equitable tolling would not apply here. Tolling

18

is a fact-bound inquiry, and the Court does not here decide its applicability; it notes only that CTR's conjecture that "tolling does not make sense" is not enough to establish mootness. See CTR MSJ at 23.

FEC v. Akins itself illustrates these principles in action. As Plaintiffs observe, the administrative complaint in Akins was filed before the FEC in 1989 and concerned conduct that occurred between 1980 and 1990; the Supreme Court nonetheless held Plaintiffs' injury there redressable in 1998. See 524 U.S. at 17, 25. (Indeed, the litigation continued through 2010. See FEC v. Akins, 736 F. Supp. 2d 9, 13–16 (D.D.C. 2010).) This Court thus finds itself in good company in concluding that no jurisdictional bar precludes a court from reaching the merits more than five years after the relevant conduct.

Second, CTR contends that it would be incapable at this point of producing the records CLC seeks. That dog won't hunt either. CTR and HFA do not contest that both are still regarded as active by the FEC; indeed, there is some irony in the organizations intervening to argue that they no longer exist. See CLC MSJ at 38 & n.9. And even if some evidence has been lost to the sands of time, there is no reason to think that an FEC investigation could not recover at least some of the sought information. The case is thus not moot, and (as the Circuit held) Plaintiffs have standing.

\* \* \*

Because the Commission's decision was based on an impermissible interpretation of the Act and was otherwise arbitrary and capricious, its dismissal of Plaintiffs' complaint was contrary to law. The Court leaves it to the expert Commission on remand to sketch the bounds of the internet exemption and to more fully analyze the facts before it. That exception must have

real bounds, however, and the clear evidence of coordination discussed above shall inform the Commission's analysis.

### IV. Conclusion

For the foregoing reasons, the Court will grant CLC's Motion for Summary Judgment, deny CTR's, and direct the Commission to conform with this decision within 30 days. See 52 U.S.C. § 30109(a)(8)(C). A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date: December 8, 2022