**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CAMPAIGN LEGAL CENTER, *et al.,* ) | |
| ) | |
| Plaintiffs, ) | Civ. No. 19-2336 (JEB) |
| ) | |
| v. ) | |
| ) | |
| FEDERAL ELECTION COMMISSION, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | MOTION FOR STAY |
| Hillary for America, et al., ) | PENDING APPEAL |
| ) | |
| Defendant-Intervenors. ) | |
| ) | |

**DEFENDANT FEDERAL ELECTION COMMISSION'S**
**MOTION FOR STAY OF REMAND ORDER PENDING APPEAL**

Pursuant to Federal Rule of Civil Procedure 62, defendant Federal Election Commission

("FEC" or "Commission") moves this Court for a stay of its December 8, 2022, Order — which

granted plaintiffs summary judgment and ordered the Commission to conform with its decision

within 30 days — pending the Commission's appeal to the United States Court of Appeals for

the District of Columbia Circuit.

A stay of the order compelling the Commission to conform with this court's ruling is

warranted to permit the FEC to seek further review at the Court of Appeals.  In the absence of a

stay, the Commission will face the dilemma of either taking action on the underlying

administrative complaint — which would in all likelihood moot its appeal — or permanently

losing exclusive civil enforcement jurisdiction over the case by triggering a private right of

action under 52 U.S.C. § 30109(a)(8)(C).  Conversely, plaintiffs will face only minimal harm if a

stay of the Commission's conformance period is granted, as the additional time necessary for

appellate review will only marginally add to the total duration of this case, which involves

campaign conduct related to the 2016 presidential election.  And though the Court has already

ruled in favor of the opposing party (as is always the case when stays pending appeal are

considered), the questions the FEC seeks to argue on appeal are substantial and establish its

likelihood of success on the merits.  This Court should grant a stay to permit these worthy issues

to be considered by the Court of Appeals.

**ARGUMENT**

I.      **STANDARD OF REVIEW**

A party seeking a stay pending appeal bears the burden of showing such a stay is

warranted upon consideration of four factors:  "(1) whether the stay applicant has made a strong

showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably

injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties

interested in the proceeding; and (4) where the public interest lies."  *Nken v. Holder*, 556 U.S.

418, 434 (2009).  "When the government is a party, its 'harm and the public interest are one and

the same, because the government's interest *is* the public interest.'"  *Ala. Ass'n of Realtors v.*

*U.S. Dep't of Health & Human Servs.*, 539 F. Supp. 3d 211, 213 (D.D.C. 2021) (quoting

*Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016)).

Although the precise balance between these four factors remains an open question,

"courts in this Circuit have continued to analyze the four factors 'on a sliding scale whereby a

strong showing on one factor could make up for a weaker showing on another.'"  *Id.* at 213

(quoting *NAACP v. Trump*, 321 F. Supp. 3d 143, 146 (D.D.C. 2018)).  Under that framework, a

movant may "remedy a lesser showing of likelihood of success on the merits with a strong

2

showing as to the other three factors, provided that the issue on appeal presents a 'serious legal question' on the merits." *Cigar Ass'n of Am. v. U.S. Food & Drug Admin.*, 317 F. Supp. 3d 555, 560 (D.D.C. 2018) (quoting *Wash. Metro Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977)).

## II.     THE COMMISSION FACES IRREPARABLE HARM IN THE ABSENCE OF A STAY PENDING APPEAL

Absent a stay of the order directing the FEC to conform, the Commission will have no practical ability to challenge this Court's interpretation and application of FECA and the internet exemption to the administrative dismissal plaintiff challenges.  Irreparable harm is established by a "*de facto* deprivation of the basic right to appeal," which would be the case here. *Republican Nat'l Comm. v. Pelosi*, No. 22-659, 2022 WL 1604670, at *4 (D.D.C. May 20, 2022); *Ctr. for Int'l Envtl. Law v. Office of U.S. Trade Representative*, 240 F. Supp. 2d 21, 23 (D.D.C. 2003).  If the Court's order is not stayed, the Commission would essentially be put to an untenable choice: conform and give up the right to appeal or give up its jurisdiction over this case.  Should the Commission elect to conform to the Court's order despite disagreeing with it, the FEC would effectively lose any opportunity to seek review of that order because its remand proceedings would be governed by the legal standards articulated in the decision. *See, e.g.*, *County of Los Angeles v. Shalala*, 192 F.3d 1005, 1012 (D.C. Cir. 1999); *Maine Med. Ctr. v. Burwell*, 841 F.3d 10, 16 (1st Cir. 2016).

Even if the Commission elected to dismiss the administrative complaint on other grounds, it would have lost its ability to directly raise its arguments in a higher court. *Cf. Citizens for Responsibility & Ethics in Wash. v. FEC*, 2022 WL 17578942, at *5 (D.C. Cir. Dec. 12, 2022) (Millett, J., dissenting from denial of rehearing *en banc*) (criticizing a controlling group of FEC commissioners for purportedly failing to adhere to district court remand order in

later case).  And if the Commission took steps to enforce FECA as this Court directed, it could

obviously not appeal a conciliation agreement or successful enforcement action on the grounds

that the charge was legally invalid.

Should the Commission elect not to conform, by contrast, that would trigger the

plaintiffs' right to bring a private lawsuit against the administrative respondents and the

Commission would lose its otherwise exclusive civil jurisdiction over enforcement of claims of

FECA violations.  52 U.S.C. § 30109(a)(8)(C); *see id.* § 30107(a)(6).  At a minimum, that would

result in duplicative proceedings as the private right of action advanced in this Court while the

Court of Appeals considered the Commission's case.

For similar reasons, a stay of the period for conformance would also promote judicial

economy and is therefore in the public interest.  Were the Commission required to conform while

an appeal is pending, it would be forced to apply this Court's interpretation of the internet

exemption while at the same time defending the controlling statement at the Court of Appeals.

That approach would undoubtedly cause confusion in the regulated community.

The dangers of this approach are not hypothetical.  In *FEC v. National Republican*

*Senatorial Committee*, the Commission felt compelled to apply a district court's view of the law

after it had rejected the agency's original reasoning behind a dismissal of an administrative

complaint.  966 F.2d 1471 (D.C. Cir. 1992).  After the remand, the Commission filed an

enforcement action against the respondent, applying the district court's views.  When the

administrative respondent appealed the subsequent enforcement litigation, the Court of Appeals

deferred to the views of the original controlling Commissioners and ordered the case dismissed.

*Id.* At 1476-78.  As that court noted, the "district judge's decision in the first phase of this case

did not cause the scales to fall from the Commissioners' eyes, did not persuade them, did not in

any way cause them to exercise their expertise or policymaking judgment — the twin fonts from which our deference to the Commission flows." *Id.* At 1476.  The Commission had evenly divided over whether to take an appeal from that original decision, and therefore did not appeal, but the opinion aptly counsels in favor of preserving space for appellate review prior to requiring the Commission to conform.

### III.   A STAY PENDING APPEAL WILL NOT SUBSTANTIALLY INJURE PLAINTIFFS

Plaintiffs' claimed injury in this case is that they "lack access" to the "disaggregated" spending reports that would reveal how much of Correct the Record's spending was coordinated with Hillary Clinton's 2016 presidential campaign committee, Hillary for America. *Campaign Legal Ctr. v. FEC*, 31 F.4th 781, 790-93 (D.C. Cir. 2022).  Those reports would reveal information related to a failed 2016 presidential campaign and a candidate who has not subsequently sought elected office.  Correct the Record, moreover, is no longer a going concern. While the Court of Appeals ruled that this information "will no doubt 'help [plaintiffs] evaluate candidates for public office,'" *id.* (quoting *FEC v. Akins*, 524 U.S. 11, 21 (1998), no currently active candidate's or committee's spending records are involved in this case.  As such, there is little imminent need for plaintiff to access the information plaintiffs seek now, even if they are correct that they are entitled to it.

To be sure, the Commission recognizes that disclosure of campaign finance information FECA requires be made public will sometimes be time sensitive.  *Cf. WP Company LLC v. U.S. Small Business Admin.*, Nos. 20-1240, 20-1614, 2020 WL 6887623, at *4 (D.D.C. Nov. 24, 2020) (noting the public's "urgent and immediate interest in assessing" administration of small-business relief package because it would "inform a critical, ongoing federal debate" and help "remedy failures in the loan-disbursement process moving forward").  Here, however, the

marginal extra time that an appeal will add to final resolution of this case is minimal compared

with the time that has already elapsed.

**IV.     THE COMMISSION IS LIKELY TO SUCCEED ON THE MERITS, OR AT LEAST PRESENTS A SERIOUS LEGAL QUESTION**

The Commission recognizes that the Court has written five opinions addressing aspects

of this matter and will not belabor the merits of this case more than is necessary to establish an

entitlement to a stay.  Suffice it to say that this case involves a decision by a controlling group of

Commissioners to dismiss an administrative complaint based on their interpretation of FEC

regulations — the so-called "internet exemption" — that exclude certain internet

communications not placed for a fee from being an in-kind contribution to a campaign even if

that campaign coordinates with the third party regarding the activity.  Mem. Op. 3-4.  *See* 11

C.F.R. § 100.26 (excluding "communications over the Internet, except for communications

placed for a fee on another person's Web site" from the definition of "public communication").

Under those regulations, a "coordinated communication" is an in-kind contribution to a

candidate, political committee, or political party if it satisfies a three-pronged test, including a

payment prong, a content prong, and a conduct prong.  *See* 11 C.F.R. § 100.21.  As relevant here,

the content prong of that test is satisfied only if the communication is an "electioneering

communication" or a "public communication."  *Id.* § 109.21(c)(1)-(5).  Because Commission

regulations exclude unpaid internet communications from the definition of "public

communication," such communications can never be in-kind contributions.[1]

---

[1]      As the controlling Commissioners noted, the definition of "electioneering communication" includes only "broadcast, cable, or satellite communication[s]" and therefore does not apply to communications on the internet, whether or not they were placed for a fee. 52 U.S.C. § 30104(f)(3); 11 C.F.R. § 100.29(a), (b)(1); J.A. 389.

Plaintiffs' administrative complaint contended that the intervenor-defendants violated FECA because Correct the Record made excessive and prohibited in-kind contributions to Hillary for America because they were coordinated and were not excluded by the internet exemption. Two FEC Commissioners, enough to block further enforcement, concluded there was not "reason to believe" intervenor-defendants violated FECA. These controlling Commissioners concluded that the majority of Correct the Record's expenses could not be in-kind contributions because they reflected the input costs of creating the communication to be placed on the internet for no fee and therefore were excluded by the internet exemption. The controlling Commissioners also concluded that evidence related to other expenses that were indisputably not for internet communications did not create reason to believe FECA violations had occurred because (1) "the complaints fail to provide the Commission with information showing that Correct the Record did not receive fair market compensation for Hillary for America" (J.A. 85 [SOR 14].); and (2) that the record did not suggest that intervenor-defendants coordinated on anything beyond the unpaid internet communications that Commission regulations exempted from regulation (J.A. 87 [SOR 16].)

This Court concluded that the controlling Commissioner's interpretation of the internet exemption to apply to all input costs to those communications was contrary to law. Because this case involves a controlling group's application of a Commission regulation, however, judicial review of that decision should give "'controlling weight'" to the controlling group's interpretation "'unless it is plainly erroneous or inconsistent with the regulation.'" *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945)).

The controlling Commissioners' Statement of Reasons based its conclusion that Correct the Record's expenses for online communications, including input costs, were not in-kind contributions on the "plain text of" the internet exemption and prior enforcement cases. (J.A. 83-84 [SOR 12-13].) The Court appears to have focused on whether that "decision contravenes FECA's plain language" (Mem. Op. at 11) or the explanation underlying the adoption of the internet exemption (*id.* at 12-13), while arguably failing to consider whether the controlling Commissioners' reasoning was permissible under the text of its regulations. The Court of Appeals should be permitted to consider the argument that the Court in essence jumped straight from the facts the Commission considered to the statutory text, which does not explicitly address how FECA should apply to internet communications and the costs to create them, and elided analysis of the regulatory text on which the controlling Commissioners relied.

Reasoning the way it did, the Court concluded that "the internet exemption must be meaningfully bounded" to "comply with [FECA's] statutory language." (Mem. Op. at 11.) But as the Court previously observed in concluding that plaintiffs' Administrative Procedure Act claim was precluded by FECA's special review provision, plaintiffs here do not make any "attack on the facial validity of any regulation." (Dkt. No. 53, at 5.) The question this case presents, it should be argued on appeal, is not whether the internet exemption is appropriately bounded to the statutory text, but whether the controlling group's decision reasonably applies the regulation.[2]

This Court also concluded that the controlling Commissioner's conclusion that the record evidence as to Correct the Record's offline activities did not support reason to believe they were

---

[2]     The Court also placed at least some weight on the fact that the Commission had not appeared to defend itself in court. (*See* Mem. Op. at 12.) The Court of Appeals would have the benefit of considering the issues without that concern at that stage.

8

in-kind contributions was arbitrary and capricious because it did not "meaningfully consider" that organization's "broad statements of intent to coordinate and instead looked for 'transaction-by-transaction' evidence of coordination." (Mem. Op. at 16.) That conclusion is potentially erroneous for two reasons.

First, this Court never contested the controlling Commissioners' legal conclusion that an expenditure is only an in-kind contribution if *that transaction* is coordinated, not if an entity declares its intent to coordinate with a candidate as a general matter. The relevant statutory and regulatory language confirms that whether an expense is an in-kind contribution depends on whether the "*expenditure*[]" is made "in cooperation, consultation, or concert, with, or at the request or suggestion of" the candidate, not whether the outside group intends to coordinate generally. 52 U.S.C. § 30116(a)(7)(B)(i) (emphasis added); *see also* 11 C.F.R. 109.20(b) ("Any *expenditure* that is coordinated [is] an in-kind contribution . . . ."). The controlling Commissioners' insistence on assessing whether the record established any connection between the intervenor-defendants' coordination and the relevant transactions was a reasonable method of implementing that requirement at the reason-to-believe stage.

Second, though this Court suggested that the controlling Commissioners "fail[ed] to engage" with the public information suggesting broad coordination between Correct the Record and Hillary for America, their Statement of Reasons arguably did consider that information and simply reached different conclusions than the Court would have. Indeed, the controlling Commissioners specifically addressed the statements cited by the Court. *Compare* Mem. Op. 15-16 (citing Correct the Record press release and David Brock interview) *with* J.A. 226 (quoting the press release language cited by the Court) *and* J.A. 6-7 (addressing Brock interview). The controlling Commissioners also cited other evidence suggesting that the Clinton

Campaign had paid fair market value for some of the services cited and had not coordinated on

other services.  (*See* J.A. 229.)  The controlling Commissioners concluded that nothing in

plaintiffs' administrative complaint suggested otherwise.  (*See* J.A. 240.)  Those Commissioners

were simply unwilling to conclude that Correct the Record's statement that it would be able to

coordinate much or most of its activities with the Clinton campaign established that there was

reason to believe that *all* of Correct the Record's expenses were in-kind contributions.  While

this Court would have reached a different conclusion in the first instance, that difference of

opinion arguably should not have negated the "rational connection" between the facts in the

record and the choice the controlling Commissioners made.  *Airmotive Eng'g Corp. v. FAA*, 882

F.3d 1157, 1159 (D.C. Cir. 2018).

Pursuant to Local Civil Rule 7(m), counsel for the FEC has conferred with counsel for

the other parties.  Counsel for the plaintiffs oppose this motion.  Counsel for the intervenor-

defendants takes no position on this motion.

\*       \*       \*       \*

Even if the Court maintains its opinion that the controlling Commissioners' reasoning in

this matter was contrary to law, the Commission respectfully submits that the questions

presented by this case are worthy of consideration by the Court of Appeals before the agency is

required to conform to the Court's ruling.  While the Commission believes it has established that

it is likely to succeed on the merits of its appeal, at a minimum this case presents serious legal

questions worthy of appellate consideration before the Commission must conform.

## CONCLUSION

For the foregoing reasons, this Court should grant the Commission's motion to stay the

judgment pending appeal.

Respectfully submitted,

Lisa J. Stevenson (D.C. Bar No. 457628)
Acting General Counsel
lstevenson@fec.gov

Kevin Deeley
Associate General Counsel
kdeeley@fec.gov

Jacob S. Siler (D.C. Bar No. 1003383)
Assistant General Counsel
jsiler@fec.gov

/s/ *Greg J. Mueller*
Greg J. Mueller (D.C. Bar. No. 462840)
Attorney
gmueller@fec.gov

COUNSEL FOR DEFENDANT
FEDERAL ELECTION COMMISSION
1050 First Street, NE
Washington, DC 20463
(202) 694-1650

December 21, 2022