UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CAMPAIGN LEGAL CENTER**, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>**FEDERAL ELECTION COMMISSION**,<br><br>Defendant,<br><br>and<br><br>**HILLARY FOR AMERICA**, *et al.*,<br><br>Defendant-Intervenors. | Civil Action No. 19-2336 (JEB) |

**MEMORANDUM OPINION**

    This long-running dispute began in 2016, when Plaintiff Campaign Legal Center filed with the Federal Election Commission an administrative complaint alleging that Super PAC Correct the Record (CTR) and Hillary Clinton's campaign, officially called Hillary for America (HFA), failed to report millions of dollars' worth of in-kind contributions in connection with her 2016 presidential run. After the FEC declined to investigate those allegations and dismissed the complaint in 2019, CLC and one of its directors, Catherine Hinckley Kelley, brought this lawsuit against the agency to challenge that dismissal. This Court eventually held in December 2022 that the FEC's dismissal was contrary to law. The D.C. Circuit affirmed that holding, and the matter was remanded to the Commission. On remand, the FEC once again dismissed the complaint, albeit on different grounds. Plaintiffs have now filed a Motion seeking a declaration that the Commission has not conformed with the Circuit decision and that any possible

1

conformance was untimely.  Finding that the agency did timely conform, the Court will deny the Motion.

**I.      Background**

The legal, factual, and procedural background of this case has by now been covered numerous times by this Court and twice by the D.C. Circuit.  Campaign Legal Ctr. v. FEC (CLC I), 334 F.R.D. 1, 3–4 (D.D.C. 2019); Campaign Legal Ctr. v. FEC (CLC II), 466 F. Supp. 3d 141, 146–50 (D.D.C. 2020); Campaign Legal Ctr. v. FEC (CLC III), 507 F. Supp. 3d 79, 81–83 (D.D.C. 2020); Campaign Legal Ctr. v. FEC (CLC IV), 31 F.4th 781, 784–88 (D.C. Cir. 2022); Campaign Legal Ctr. v. FEC (CLC V), 646 F. Supp. 3d 57, 59–63 (D.D.C. 2022); Campaign Legal Ctr. v. FEC (CLC VI), 106 F.4th 1175, 1179–88 (D.C. Cir. 2024).  Brief summaries of the legal framework and dispute will therefore suffice here.

   A.   Legal Framework

Congress passed the Federal Election Campaign Act in 1971 to "remedy any actual or perceived corruption of the political process."  FEC v. Akins, 524 U.S. 11, 14 (1998).  As relevant here, the Act places various restrictions — amount limitations, disclosure requirements, and the like — on contributions to candidates and sets out an enforcement scheme.  Under the statute, any person who believes that a violation has occurred may file a complaint with the FEC.  See 52 U.S.C. § 30109(a)(1).  The FEC's Office of General Counsel reviews each complaint and recommends to the Commission whether the complaint provides "reason to believe" a violation has occurred.  Id. § 30109(a)(2)–(3).  The FEC Commissioners (six when at full complement) then vote on whether there is "reason to believe" the Act was violated.  Id. §§ 30106(a)(1), 30109(a)(2).  If at least four Commissioners vote yes, the FEC will investigate and potentially

pursue an enforcement action; otherwise, the complaint may not go forward. Id. §§ 30106(c), 30109(a)(2).

"Any party aggrieved" by the dismissal of a complaint may then sue the Commission, seeking a court "declaration" that the dismissal is "contrary to law." See id. § 30109(a)(8)(A)–(C). For the agency to appear in court to defend itself, the affirmative votes of four Commissioners are required. Id., §§ 30106(c), 30107(a)(6). Courts have held that if the FEC does not find reason to believe a violation has occurred, the "declining-to-go-ahead" Commissioners — or the "controlling Commissioners," in FECA parlance — must issue a Statement of Reasons. See CLC VI, 106 F.4th at 1183. Those Statements are "intended to explain why those commissioners saw no reason to believe a violation occurred, and thereby aid the reviewing court to 'intelligently determine whether the Commission is acting contrary to law.'" Id. (quoting Democratic Cong. Campaign Comm. v. FEC, 831 F.2d 1131, 1132 (D.C. Cir. 1987)). If a court finds that the agency's dismissal of a complaint is contrary to law, it "may declare" as much and "direct the Commission to conform with [that] declaration within 30 days." Id. at 1182; see 52 U.S.C. § 30109(a)(8)(C). If the FEC does not so conform, the original complainant can bring "a civil action" — known as a citizen suit — against the subject of the complaint "to remedy the violation" alleged "in the original complaint." 52 U.S.C. § 30109(a)(8)(C). There are thus two preconditions to a citizen suit: (1) a court must declare that the FEC actions regarding a complaint are contrary to law and must order the agency to conform with that declaration; and (2) the Commission must fail to timely conform with that order.

    B.  Factual Background

CLC is a nonprofit campaign-finance watchdog group that filed an administrative complaint with the FEC in October 2016. CLC V, 646 F. Supp. 3d at 61. It alleged that Super

PAC CTR had improperly coordinated expenditures with the Hillary Clinton campaign, HFA, without disclosing them as in-kind contributions and in gross violation of FECA's contribution limits. Id. CTR rejoined that this spending was appropriate because it fell under the so-called "internet exemption," which excludes certain expenses related to unpaid internet communications from the definition of in-kind contributions. Id. Although the FEC's Office of General Counsel investigated the allegations and recommended finding reason to believe that several violations had occurred, the agency itself rejected the OGC's recommendation and dismissed the administrative complaint without further action by a 2-2 deadlocked vote. Id. The two controlling Commissioners, in a Statement of Reasons, agreed with CTR that its expenditures fell under FECA's internet exemption and therefore did not need to be reported as in-kind contributions. Id. at 61–62.

In August 2019, Plaintiffs filed suit challenging the FEC's dismissal order under 52 U.S.C. § 30109(a)(8). See ECF No. 1 (Compl.) at 22–23; see also ECF No. 15 (Am. Compl.). The agency, however, did not garner the majority required by 52 U.S.C. §§ 30106(c) and 30107(a)(6) to defend this civil suit and thus defaulted. CLC I, 334 F.R.D. at 3–4. Notwithstanding the Commission's default, this Court permitted HFA and CTR to intervene as Defendants in November 2019 over Plaintiffs' objection. Id. at 5–7. After an initial dismissal for lack of standing and subsequent reversal by the D.C. Circuit, see CLC III, 507 F. Supp. 3d 79, rev'd, CLC IV, 31 F.4th 781, this Court held that the controlling Commissioners' Statement of Reasons rested on a flawed and overly broad interpretation of the internet exemption. CLC V, 646 F. Supp. 3d at 64–66. The Court did not, however, delineate the precise scope of that exemption and, instead, left the Commission to further define its limits. Id. at 66.

4

The D.C. Circuit affirmed this Court's decision in July 2024. See CLC VI, 106 F.4th 1175. Agreeing that the FEC's "analysis of non-internet-related expenditures was arbitrary and capricious and thus contrary to law," the panel "direct[ed] remand to the expert Commission to 'sketch the bounds of the internet exemption and . . . more fully analyze the facts before it.'" Id. at 1194–95 (omission in original) (quoting CLC V, 646 F. Supp. 3d at 69). After the Circuit's mandate issued in September, this Court ordered that the matter be remanded to the FEC on September 20 "in accordance with the opinion of the D.C. Circuit." Minute Order of Sept. 12, 2024.

In response to the remand, the FEC held a series of votes on the allegations in the complaint on October 10, 2024. In each of those votes, the agency failed by a vote of 2-4 to find reason to believe that CTR and HFA had violated FECA. See ECF No. 86 (Oct. 11 Notice) at 1–3. The Commission ultimately decided by a vote of 5-1 to dismiss the complaint and close the file 30 days after the vote's certification. Id. at 3. The next day, the FEC filed a notice with this Court informing it of these developments. Id. That notice, which listed the subjects of the votes and their tallies, did not contain any information about the Commissioners' reasoning.

On October 30, Plaintiffs filed this Motion seeking a declaration that the FEC had not conformed with the Court's Order remanding this matter in accordance with the Circuit's opinion. See ECF No. 89 (Mot.). The same day, the agency filed another notice informing the Court that it had voted on October 23 to direct its General Counsel to "draft a Notice of Proposed Rulemaking to consider whether to revise the Commission's regulation [governing the internet exemption] to delineate the scope of that regulation with respect to input costs." ECF No. 88 (Oct. 30 Notice) (quotation marks omitted).

On November 5, 2024, three of the four Commissioners who had voted against finding reason to believe, joined by the Commissioner who would have found reason to believe but nevertheless voted to dismiss, issued a Statement of Reasons. See ECF No. 94-1 (Majority SOR). Those Commissioners, comprising a majority of the FEC, wrote that they had "voted to dismiss this matter in an exercise of our prosecutorial discretion." Majority SOR at 5. Specifically, the majority Commissioners explained that CTR and HFA had long since terminated, and, as a result, "records needed to determine the extent of any expenditures or contributions, assuming they were properly maintained, may be difficult to obtain." Id. The majority Commissioners further stated that "the statute of limitations has expired, rendering any further enforcement a drain on the agency's already limited resources," noting "the need to conserve resources for meritorious matters arising from more recent election cycles, including the current one." Id.

"[M]indful" that they had not followed the Circuit's instruction to "sketch the bounds of the internet exemption," the majority Commissioners further declared that they intended to do so by "prepar[ing] the documents required for a rulemaking addressing unanswered questions concerning allocation of expenses under the internet exemption." Id. The majority Commissioners explained that they "believe[d] any such clarifications should be made with input from the public and the protections of the Administrative Procedure Act, and that they should apply broadly, not merely to one entity that finds itself the subject of a complaint." Id. They added that they "[did] not believe it would be appropriate for the Commission to develop a binding interpretation of the internet exemption in the context of this enforcement matter under the gun of a thirty-day remand." Id.

The fourth no-voting Commissioner, Sean J. Cooksey, issued a separate Statement of Reasons on November 6. See ECF No. 94-2 (Cooksey SOR). He expressed his substantive views on the proper scope of the internet exemption but agreed with the majority Commissioners that dismissal was appropriate given the expiration of the statute of limitations and termination of CTR and HFA, echoing that enforcement "would necessitate disproportionate use of the agency's time and resources due to the age of the allegations and the likely difficulty of obtaining any relevant evidence at this point." Id. at 2, 9–12.

The FEC and Intervenors filed their Oppositions to CLC's Motion at the end of November, see ECF Nos. 94 (FEC Opp.), 95 (Intervenors Opp.). While the contrary-to-law appeal was pending before the D.C. Circuit, CLC nevertheless initiated a private action against CTR and HFA under FECA's provision allowing citizen suits to enforce the federal election laws. See CLC v. Correct the Record, No. 23-75 (D.D.C.). This Court, which also presides over that citizen suit, stayed that action pending the D.C. Circuit's resolution of the contrary-to-law case. See id., ECF No. 16 (Stay Order). The same day it filed its Motion in this case, CLC filed a Motion to Lift the Stay there. See id., ECF No. 23 (Stay Mot.). Having reviewed the filings in both this action and the citizen suit, the Court is now prepared to rule on both Motions.

## II. Analysis

Plaintiffs offer two distinct arguments: first, the FEC failed to conform with this Court's and the D.C. Circuit's contrary-to-law declarations; and second, even if the Commission's actions technically conformed, they were untimely. The Court addresses each in turn.

### A. Conformance

Plaintiffs contend that the FEC did not conform with the Court's Order remanding the case "in accordance with the opinion of the D.C. Circuit." Minute Order of Sept. 12, 2024. This

Court and the D.C. Circuit instructed the Commission to "sketch the bounds of the internet exemption and . . . more fully analyze the facts before it." CLC VI, 106 F.4th at 1194 (omission in original) (quoting CLC V, 646 F. Supp. 3d at 69). Plaintiffs contend that the agency ignored that directive when it declined to substantively discuss the internet exemption and instead dismissed the complaint on prosecutorial-discretion grounds.

Plaintiffs' theory, while not without intuitive appeal, relies on a too-blinkered view of what constitutes conformance. In any remand situation, the initial body is not shackled to the reasoning of the reviewing court; rather, it is free to resolve the case on alternative grounds. For instance, say a court of appeals reverses a district court on the merits of a legal issue and remands to the lower court for further proceedings consistent with that opinion. If the district court discovers on remand that the plaintiff in fact lacks standing to sue, it could — and indeed, must — dismiss the case on that basis. See, e.g., Role Models Am., Inc. v. Harvey, 459 F. Supp. 2d 28, 33–34 (D.D.C. 2006) (taking this approach). It makes no difference that the appellate tribunal expected a ruling on the merits, as long as the lower court's resolution does not repeat the previously identified shortcomings. Similarly, the D.C. Circuit has long held that a remand to the Federal Energy Regulatory Commission "restores jurisdiction to the Commission and 'discretion to reconsider the whole of its original decision.'" Canadian Ass'n of Petroleum Prods. v. FERC, 254 F.3d 289, 298 (D.C. Cir. 2001) (quoting Se. Mich. Gas Co. v. FERC, 133 F.3d 34, 38 (D.C. Cir. 1998)). That is true even when the remanding opinion "prescribed affirmatively what the Commission was required to do." Id. It is clear, then, that "[a]s a general proposition, an administrative tribunal is free on remand to reach the same result" or a different one "on different grounds." City of Charlottesville v. FERC, 774 F.2d 1205, 1212 (D.C. Cir. 1985) (cleaned up).

The same principle must apply to judicial remands to the FEC: regardless of the basis of the remand, the Commission regains jurisdiction and is free to reach its result through any pathway that is permissible in light of that remand. Indeed, both the Supreme Court and our Circuit have recognized in FEC cases that "[i]f a reviewing court agrees that the agency misinterpreted the law, it will set aside the agency's action and remand the case — even though the agency (like a new jury after a mistrial) might later, in the exercise of its lawful discretion, reach the same result for a different reason." Akins, 524 U.S. at 25; see End Citizens United PAC v. FEC (ECU), 69 F.4th 916 (D.C. Cir. 2023). Here, then, the Commission was not barred from reaching the same result as it initially had (*i.e.*, dismissing the complaint) based on grounds anticipated by neither reviewing court.

The question now becomes whether, bearing those principles in mind, the FEC's actions in this case in fact conformed with the Circuit's contrary-to-law declaration. As the Court of Appeals has crystallized, "What constitutes conformance . . . necessarily turns on the kind of Commission action the contrary-to-law plaintiff was entitled to compel by bringing her contrary-to-law suit. And what the plaintiff can compel is the action whose nonperformance by the Commission 'aggrieved' her." Campaign Legal Ctr. v. 45Committee, Inc., 118 F.4th 378, 390 (D.C. Cir. 2024). In the case of a contrary-to-law suit based on a mistaken statutory construction, that action must constitute reengagement with the allegations in the complaint — through a reason-to-believe vote — that does not rely on the erroneous construction. It follows that if the FEC, having been defeated in the contrary-to-law suit, again opts not to bring an enforcement action but this time for reasons other than the legal rationale deemed defective by the court, it has conformed with the contrary-to-law declaration. That is because CLC's original reason for "aggrieve[ment]," 52 U.S.C. § 30109(a)(8), was not the Commission's failure to

9

affirmatively find reason to believe, but rather to do so in reliance on a misinterpretation of the law (here, the internet exemption). In short, in requiring conformance on remand, FECA entitles successful contrary-to-law plaintiffs like CLC to compel the FEC to reengage with their complaints without applying already-identified legal mistakes, but "it does not entitle [them] to a particular vote outcome." 45Committee, 118 F.4th at 392.

Plaintiffs themselves acknowledge that "the D.C. Circuit . . . did not require the FEC to take any particular enforcement action." Mot. at ECF p.4. They instead insist that, whenever a court orders the FEC to reconsider certain legal questions, the Commission should be absolutely forbidden from relying on discretionary considerations on remand. See ECF No. 96 (Reply) at 3, 13–14. Otherwise, Plaintiffs argue, the preconditions for a citizen suit will never be satisfied and FECA's private-enforcement scheme will be thwarted.

The FEC, however, has unlimited latitude to decline to bring an enforcement action. See CREW v. FEC, 892 F.3d 434, 438 (D.C. Cir. 2018) ("[F]ederal administrative agencies in general and the Federal Election Commission in particular have unreviewable prosecutorial discretion to determine whether to bring an enforcement action."); CREW v. FEC, 55 F.4th 918, 923 (D.C. Cir. 2022) (Millett, J., dissenting from denial of rehearing *en banc*) ("The statute . . . never requires the agency to bring an enforcement action that it does not want to bring."). The basis for such declinations may be considerations of prosecutorial discretion, which have been deemed virtually unreviewable, see End Citizens United PAC v. FEC, 90 F.4th 1172, 1178–79 (D.C. Cir. 2024) ("When the Commission's dismissal rests even in part on prosecutorial discretion, it is not subject to judicial review.") — at least for now. See End Citizens United PAC v. FEC, 2024 WL 4524248 (D.C. Cir. Oct. 15, 2024) (vacating 90 F.4th 1172 and granting rehearing *en banc* on this issue).

Regardless of the D.C. Circuit's ultimate elucidation of the reviewability of FEC decisions based on prosecutorial discretion, it remains clear that the agency is free to make nonenforcement decisions based on prudential considerations that are "distinct from and lack a clear nexus to any reviewable legal analysis." Campaign Legal Ctr. v. FEC, 89 F.4th 936, 941 (D.C. Cir. 2024). Such "classic criteri[a] in the exercise of prosecutorial discretion" include "the agency's priorities and resource allocation." Id. The Court will not carve out an exception to that as-yet well-established principle by forbidding the FEC from relying on discretionary concerns on remand — even for situations like this one, where the agency has apparently charted a careful path to avoid investigating potential violations of the election laws despite strong indications from its own General Counsel and two courts that the allegations were meritorious. The Court appreciates Plaintiffs' point that, if the FEC declines to bring an enforcement action given concerns about limited resources, that should provide all the more reason for a private plaintiff to "take up the mantle" using its own means. See Reply at 14–15. The Court, however, is bound by the regulatory scheme Congress has constructed and the D.C. Circuit has interpreted.

In light of these principles, the Commission conformed. In order to assess the FEC's conformance, the Court need only determine that the agency's rationale was free from the legal reasoning deemed impermissible in CLC VI. It was. The majority Commissioners described the potential difficulty of obtaining relevant records, the "drain on the agency's already limited resources," and "the need to conserve resources for meritorious matters arising from more recent election cycles." Majority SOR at 5; accord Cooksey SOR at 10–11 (detailing "difficulties in investigating the claims and gathering evidence at this time" and his concerns about "how to allocate the agency's limited enforcement resources and whether this matter warrants its attention relative to other, more pressing priorities"). By declining enforcement, the FEC

11

reengaged with the allegations in the complaint. As the Statements of Reasons make clear, that engagement was not based on any misapprehension of the internet exemption the D.C. Circuit had previously rejected. The Court thus concludes that the Commission sidestepped on remand the maladies diagnosed by this Court and the D.C. Circuit and thus conformed with the declaration that its earlier action was contrary to law.

Last, even assuming *arguendo* that the FEC was further obligated to engage with the merits of the internet exemption (which the Court doubts), its decision to initiate a rulemaking about the exemption's scope was sufficient to conform. Recall, the agency voted on October 23 to direct the General Counsel to "draft a Notice of Proposed Rulemaking to consider whether to revise the Commission's [regulation governing the internet exemption] to delineate the scope of that regulation with respect to input costs." Oct. 30 Notice. Because of the unusual procedural posture in which we find ourselves, no caselaw exists to guide the Court in determining whether a prospective rulemaking can constitute conformance with a contrary-to-law declaration.

Reasoning from first principles, however, the Court believes that when the FEC is required on remand to reconsider a legal issue, initiating a rulemaking fulfills that duty. The agency, as explained, has conformed with regard to this particular complaint by dismissing it based on an analysis unencumbered by the legal deficiencies identified by this Court and the D.C. Circuit. Any remaining obligation on the part of the FEC, then, could only be to explore the general applicability of the internet exemption to entities writ large. By initiating a rulemaking on the scope of that exemption, the agency has done so. While it could also have met such an obligation by delineating the scope of the internet exemption in the remanded matter, the Court finds reasonable the majority Commissioners' explanation that they "[did] not believe it would be appropriate for the Commission to develop a binding interpretation of the

internet exemption in the context of this enforcement matter under the gun of a thirty-day remand" and that "such clarifications should be made with input from the public and the protections of the Administrative Procedure Act." Majority SOR at 5.

Plaintiffs raise several additional objections to the Court's conclusion, none of which carries the day. They first complain that the October 23 vote to draft an NPRM came 13 days after the failed reason-to-believe votes in this matter and three days after the remand period expired. See Reply at 17. The Commissioners, however, discussed ordering an NPRM at the October 10 meeting, see Oct. 30 Notice, and the majority Commissioners' Statement of Reasons makes clear that the possibility of an upcoming rulemaking influenced their behavior on that day. See Majority SOR at 5. Plaintiffs next protest that there is no guarantee that a new rule on the internet exemption will actually be adopted or that it will be legally sound. See Reply at 17. That assertion is undoubtedly true, as it is in any rulemaking situation. But the D.C. Circuit directed the FEC only to revisit the contours of the internet exemption, choosing to leave the details to the agency; the Circuit did not insist on any particular outcome. See CLC VI, 106 F.4th at 1192, 1195. Plaintiffs finally lament that allowing a rulemaking — or, rather, the mere prospect of rulemaking — to qualify as conforming action would make it too easy for the FEC to conform and consequently render FECA's right to judicial review "a farce." Reply at 18. The Court emphasizes again the D.C. Circuit's instruction that "what counts as conforming action depends on the type of contrary-to-law determination with which the Commission must conform." 45Committee, 118 F.4th at 390. Given that directive and the relatively narrow range of circumstances to which the Court's holding today could apply, it believes that Plaintiffs' rulemaking-related concern is overblown.

13

The Court accordingly concludes that the FEC took conforming action. If Plaintiffs have substantive complaints about the agency's reasons for declining to bring an enforcement action, the proper avenue for addressing those concerns is a new contrary-to-law claim.

B. Timeliness

Plaintiffs next contend that, even if the FEC's actions and reasoning can be deemed to have conformed with the contrary-to-law declaration, they were untimely.

A quick refresher on the tortuous timeline of this case: this Court remanded the matter to the FEC on September 20, 2024. The agency was obligated to conform with the contrary-to-law declaration by October 20 because FECA imposes a 30-day deadline for conformance. It held its failed reason-to-believe votes and dismissed the administrative complaint on October 10, but those votes became formally effective 30 days later (pursuant to newly established FEC procedures). See FEC Opp. at 4–5 n.5 (describing closure procedures); Oct. 11 Notice at 3 (describing vote to close file after 30 days). Plaintiffs filed their Motion on October 30. The majority Commissioners released their Statement of Reasons on November 5, and the fourth no-voting Commissioner released his Statement on November 6.

Because the Commissioners released their Statements of Reasons more than 30 days after the remand, Plaintiffs maintain that those Statements cannot be considered when assessing whether the FEC conformed with the contrary-to-law declaration. According to Plaintiffs, without the Statements and the rationale they set forth, the Court is left to review only the agency's barebones description of the votes in the notice it filed with the Court on October 11. See Mot. at ECF p. 4 & n.1; Reply at 9–11. The FEC, along with Intervenors, rejoin that the Statements of Reasons were contemporaneous with the formal closure of the matter, which

14

occurred thirty days after the actual vote and can thus properly be considered.  See FEC Opp. at 9 n.6; Intervenors Opp. at 10–11.

Plaintiffs, urging the Court to disregard the Statements of Reasons as untimely, rely on our Circuit's decision in ECU.  See Reply at 10–12 (citing 69 F.4th 916).  There, the panel held that a Statement of Reasons issued "[t]wo months after the dismissal of the administrative complaint and four days after ECU filed its lawsuit," ECU, 69 F.4th at 919, was an impermissible *post hoc* rationalization that the district court should have ignored.  Id. at 919–24.  Emphasizing the importance of agency accountability and meaningful judicial review, the court held that the controlling Commissioners "were obligated to issue a contemporaneous statement explaining their votes."  Id. at 921 (emphasis added) (quotation marks omitted).  Debating the FEC's compliance with ECU, the parties invite this Court to weigh in on the propriety of the agency's new internal closure procedures, which Plaintiffs contend allow the Commission to manufacture contemporaneity by artificially delaying the closure of a case.  See Reply at 11.  The Court declines to do so, although such procedures admittedly invite mischief, instead resolving this dispute based on its reading of ECU and the agency's conduct in this matter.

Before doing so, it notes that Statements of Reasons are meant to enable a reviewing court to "intelligently determine whether the Commission is acting contrary to law."  Democratic Cong. Campaign Comm., 831 F.2d at 1132 (emphasis added).  That is, their purpose is to facilitate contrary-to-law, rather than conformance, review.  In fact, the Court cannot find a single instance in which a court was asked — as this Court is — to review a Statement of Reasons for the purpose of assessing whether the FEC conformed with a contrary-to-law declaration, as opposed to whether such a declaration would be appropriate in the first place.

15

The two modes of review differ in meaningful ways, as Plaintiffs acknowledge. See Reply at 13 ("The analysis whether the FEC conformed on remand is . . . distinct from a review of whether its dismissal is 'contrary to law.'"). For example, while contrary-to-law review requires the court to engage in a substantive evaluation of the agency's reasoning, conformance review seeks to answer a narrower question. A court assessing conformance must, to be sure, determine "the kind of Commission action the contrary-to-law plaintiff was entitled to compel." 45Committee, 118 F.4th at 390. But the conformance court is not asked to perform the kind of top-to-bottom merits-based appraisal that the Statement of Reasons is designed to enable. The Statement, then, is an awkward fit for evaluating conformance, and the caselaw setting out the standards with which Statements of Reasons must comply does not translate neatly to the conformance context. Accord Mot. at ECF p. 5 ("Because, to plaintiffs' knowledge, the posture of this case is unique, there is no judicial authority setting forth a specific procedural route for declaring the FEC in non-conformance and resuming the existing private action.").

That being said, the Court can glean some important lessons from ECU's treatment of the Statement of Reasons at issue in that case. The ECU court was motivated chiefly by a concern that the FEC's stated reasons were "'simply convenient litigating positions' . . . to withhold the basis of its decision unless and until a lawsuit is filed and thereafter invoke prosecutorial discretion when its silence is challenged." 69 F.4th at 923 (quoting DHS v. Regents of the Univ. of Calif., 591 U.S. 1, 23 (2020)). The Circuit repeatedly noted the fact that "the presumptive subject of judicial review emerged only after ECU filed this lawsuit," evidently finding it meaningful that the controlling Commissioners waited to release their Statement of Reasons until litigation was pending. See id. at 923; see, e.g., id. at 921 ("The Commission cannot *sua*

16

*sponte* update the administrative record when an action is pending in court.") (quotation marks omitted).

The concern that the FEC will strategically adopt *post hoc* rationalizations that prejudice litigants — while in general an eminently reasonable one when dealing with this agency — does not apply with the same force here. This litigation was filed more than five years ago and has made numerous trips up and down the federal judiciary on a slew of legal issues. To the extent the Commission is inclined to adopt convenient litigating positions in response to opposing counsel's filings in this matter, it has had the ability to do so for half a decade. Although the agency did not release its Statement of Reasons until after the instant Motion was filed, it was no more on notice of Plaintiffs' likely legal arguments at that point than it would have been the day it held the reason-to-believe votes: everyone knew the legal issue would be whether the agency had conformed. The Court therefore determines that it would not advance the "important values of administrative law," id. at 923 (quotation marks omitted), to disregard the Statements of Reasons. Because the FEC would presumably have taken the same positions more immediately after the reason-to-believe votes, and because Plaintiffs have had ample opportunity to comment on the full administrative record in their Reply, the Court concludes that it is capable of performing "meaningful judicial review." Id.

True, a Statement of Reasons likely could be issued so long after the reason-to-believe vote that it could no longer qualify as demonstrative of the FEC's contemporaneous reasoning, even in a situation like this one where the Court does not suspect the agency of bait-and-switch tactics. The ECU court, after all, "did not explain just how 'contemporaneous' a 'contemporaneous' statement must be" to be considered timely. See CREW v. FEC, 2023 WL 6141887, at *12 (D.D.C. Sept. 20, 2023). Regardless of where that line falls, however, the Court

17

is satisfied that the Statements of Reasons here reflect the Commissioners' real-time thinking about why they found no reason to believe a violation had occurred. Even assuming, as CLC urges, that the relevant date is October 10 (the day of the failed reason-to-believe votes), the majority Statement of Reasons was issued 26 days later — within the realm of reason, in this context, to qualify as a contemporaneous rationale. And if the Court accepts the agency's contention that the 30-day period between the vote and the vote's formal effective date allows "the Commission to come to consensus (or at least a majority) after an initial split, reverse course entirely, or correct errors," FEC Opp. at 9 n.6, the Statements of Reasons are indeed contemporaneous with the no-reason-to-believe decision. The Court therefore concludes that the FEC's conformance with the contrary-to-law declaration was timely.

### C. Citizen Suit

A citizen suit can proceed only if the FEC has failed to timely conform with a court's declaration that the agency's actions regarding a complaint are contrary to law. As explained, that precondition has not been satisfied here. CLC's citizen suit against CTR and HFA therefore cannot go forward. The Court will deny the motion to lift the stay in that case.

*   *   *

The Court is under no illusions that the FEC has behaved admirably throughout this winding saga or that today's outcome advances the ideals of FECA's drafters. In particular, it notes the agency's recalcitrance early in this litigation, its tendency to employ procedural gamesmanship, and its eagerness to invoke prosecutorial discretion to avoid engaging with the merits of a complaint. The Court, moreover, acknowledges Plaintiffs' concerns that the Commission could in future cases offer cursory and delayed incantations of prosecutorial discretion and, in so doing, not only inoculate itself against contrary-to-law judicial review but

also effectively foreclose FECA's private-enforcement option. The FEC seemingly has now armed itself with an arsenal of "judicial-review kill switch[es]." CREW v. FEC, 55 F.4th at 922 (Millett, J., dissenting from denial of rehearing *en banc*). That being said, constrained by the regime that FECA, the FEC, and the D.C. Circuit have fashioned, the Court must conclude that the FEC has timely conformed with the contrary-to-law declaration and consequently that the citizen suit cannot proceed.

### III.    Conclusion

For the foregoing reasons, the Court will deny Plaintiffs' Motion. A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date: January 28, 2025